## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Quincy J. Allen, | ) | Case No. 0:18-cv-01544-DCC |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Michael Stephan, Warden, Broad River | ) | |
| Correctional Institution, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

This matter is before the Court on Respondent's Motion for Summary Judgment, ECF No. 51, and Motion to Strike, ECF No. 74, and Petitioner's Motion for Discovery, ECF No. 85. Petitioner, Quincy J. Allen, is a death-sentenced state prisoner seeking habeas corpus relief under 28 U.S.C. § 2254. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2) (D.S.C.), pre-trial proceedings were referred to the Honorable Paige J. Gossett, United States Magistrate Judge. On August 2, 2019, the Court unreferred Respondent's Motion for Summary Judgment for consideration without a Report and Recommendation. ECF No. 55. Having carefully considered the parties' submissions and the record in this case, the Court GRANTS Respondent's Motion for Summary Judgment, GRANTS IN PART and DENIES IN PART Respondent's Motion to Strike, and DENIES Petitioner's Motion for Discovery.

## FACTUAL BACKGROUND

The following facts are recited verbatim from the Supreme Court of South Carolina's opinion affirming Petitioner's death sentence on direct appeal:

At approximately 3:00 a.m. on July 7, 2002, Quincy Allen approached a homeless man, fifty-one year old James White, who was lying on a swinging bench in Finlay Park in downtown Columbia. Allen ordered White to stand up, and proceeded to shoot him in the shoulder.  When White fell back to the bench, Allen ordered him to stand up and shot him again.  According to Allen's subsequent statement to police, he had just gotten the shot[]gun and he used White as a practice victim because he did not know how to shoot the gun.  White survived the assault.

A few days later, on July 10, 2002, Allen met a prostitute named Dale Hall on Two Notch Road in Columbia; he took her to an isolated dead end cul-de-sac near I-77 where he shot her three times with a 12 gauge shotgun, placing the shotgun in her mouth as she pleaded for her life.  After shooting her, Allen left to purchase a can of gasoline, and came back to douse Hall's body and set her on fire.  He then went back to work at his job at the Texas Roadhouse Grill restaurant on Two Notch Road.

Several weeks later, on August 8, 2002, while working at the restaurant, Allen got into an argument with two sisters, Taneal and Tiffany Todd; he threatened Tiffany, who was then 12 weeks pregnant, that he was going to slap her so hard her baby would have a mark on it.  Tiffany's boyfriend Brian Marquis came to the restaurant, accompanied by his friend Jedediah Harr.  After a confrontation, Allen fired his shotgun into Harr's car, attempting to shoot Marquis; however, Allen missed Marquis and instead hit Harr in the right side of the head.  As the car rolled downhill, Marquis jumped out and ran into a nearby convenience store, where he was hidden in the cooler by an employee.  Allen left the convenience store, and went and set fire to the front porch of Marquis' home.  A few hours later Allen set fire to the car of Sarah Barnes, another Texas Roadhouse employee.  Harr died of the shotgun blast to his head.

The following day, Allen set fire to the car of another man, Don Bundrick, whom he apparently did not know.  Later that evening, August 9, 2002, Allen went to a strip club, Platinum Plus, in Columbia, where he pointed his shotgun at a patron. Allen left South Carolina and proceeded to New York City.  On his way back, while in North Carolina, Allen shot and killed two men at a convenience store in Surrey County.[2]  Allen then went to Texas, where he was apprehended by law enforcement on August 14th.

> [2] Allen pleaded guilty to those murders in 2004 and was sentenced to life in prison.

Allen gave statements to police outlining the details of his crimes.  He told police he began killing people because an inmate in federal prison, where Allen spent time for stealing a vehicle, had told him he could get a job as a mafia hit man.  Allen got tired of waiting and embarked on his own killing spree.  Allen told police he would have killed more people if he had had a handgun, but his prior record prohibited

him from obtaining a handgun.

*State v. Allen*, 687 S.E.2d 21, 22–23 (S.C. 2009) (footnote in original).

## PROCEDURAL HISTORY

### *Guilty Plea & Sentencing*

In September 2002, the Richland County Grand Jury indicted Petitioner for the murders of Dale Hall and Jedediah Harr, assault and battery with intent to kill, second degree arson, two counts of third degree arson, and pointing and presenting a firearm. App. 2937–50.[1] The State filed its Notice of Intent to Seek the Death Penalty on April 5, 2004. App. 2951–53. The Honorable G. Thomas Cooper, Circuit Court Judge, presided over the case and appointed E. Fielding Pringle, April Sampson, Robert Lominack, and Kim Stevens[2] to represent Petitioner. *See* App. 0010.

On February 28, 2005, Petitioner waived his right to a jury trial and pled guilty to all seven indictments. App. 0011–38. Judge Cooper accepted Petitioner's pleas and Petitioner agreed to the facts as recited by the State. App. 0023–38. The penalty phase commenced on March 7, and proceeded through March 17, 2005. App. 0040–2555. On March 18, 2005, after hearing ten days of testimony and evidence from both sides, Judge Cooper sentenced Petitioner to death for both murders. App. 2553–55. Judge Cooper memorialized his findings in a written sentencing report dated April 1, 2005. App. 2955–68.

---

[1] The Appendix is located at ECF Nos. 19–23. In addition, the Supplemental Appendix, which the Court cites as "Supp. App.," is located at ECF No. 65.

[2] Ms. Stevens also represented Petitioner in his North Carolina proceedings.

*Motion to Vacate Guilty Plea*

On February 6, 2008, through appellate counsel Robert M. Dudek and Kathrine Hudgins, Petitioner filed a motion before the Supreme Court of South Carolina to vacate his guilty plea or remand his case for a hearing on the voluntariness of his plea. App. 2997–3005. On March 5, 2008, after briefing by the State, App. 3070–91, the court denied Petitioner's motion, App. 3153.

*Direct Appeal*

Petitioner raised the following issues on direct appeal:

1.

Whether appellant's death sentence should be vacated where the court sentenced appellant to death to deter other mothers from abusing their children in the manner in which appellant's mother abused him, since the death sentence being imposed on the basis of this arbitrary factor violates the Eighth Amendment, and therefore mandates relief under S.C. Code § 16-3-25(C)(1)?

2.

Whether appellant's death sentence should be vacated where the court did not designate the finding of a statutory aggravating circumstance as mandated by S.C. Code § 16-3-20(C), and the death sentence therefore must be vacated pursuant to S.C. Code § 16-3-25(C)(2)?

3.

Whether the court erred by ruling it did not have the authority to rule that S.C. Code § 16-3-20 was unconstitutional, and by ruling that S.C. Code § 16-3-20 did not violate the Eighth and Fourteenth Amendments because it forced appellant to choose between his constitutional right to a jury trial and his constitutional right to present compelling mitigating evidence by pleading guilty, and accepting responsibility for his actions before a jury of his peers?

App. 3161. On November 16, 2009, after full briefing and oral argument, the Supreme Court of South Carolina affirmed Petitioner's convictions and sentence. *Allen*, 687 S.E.2d at 21–26.

*Post-Conviction Relief Action*

Petitioner timely filed for post-conviction relief ("PCR") in the Richland County Court of

Common Pleas. On November 12, 2014, through appointed counsel Elizabeth Franklin-Best and

Laura Young, Petitioner filed his final PCR application, raising the following grounds:

> 10(a): Applicant was denied the right to effective assistance of counsel – guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution – during the sentencing phase of his capital trial as a result of trial counsel's acts or omissions set forth below in section 11(b) [sic]. Trial counsel's performance was both unreasonable and prejudicial as outlined below. *See Strickland v. Washington*, 466 U.S. 668 (1984), *Wiggins v. Smith*, 539 U.S. 510 (2003), *Von Dohlen v. State*, 360 S.C. 598, 602 S.E.2d 738 (2004).

> 11(a): Trial counsel's acts or omissions included:
>
> (i) Encouraging Allen to plead guilty to capital murder in Richland County without adequate assurances that the trial court judge would impose Life sentences.
>
> (ii) Encouraging Applicant to plead guilty to capital murder in Richland County when statistics show that Richland County juries do not generally impose death sentences.
>
> (iii) Failing to adequately litigate issue of striking [the] death penalty on the basis of race.
>
> (iv) Failing to elicit any execution impact evidence during the sentencing hearing when that evidence would have resulted in the judge's imposing a life sentence.
>
> (v) Failing to present mitigation evidence of Applicant's childhood trauma and abuse when that evidence would have resulted in the judge's imposing a life sentence.
>
> (vi) Failing to object to the trial court judge's imposition of a death sentence at the time the sentence was rendered.
>
> (vii) Failing to object to the trial court judge's confusing the competency to be executed standard with the standard for finding applicant to be mentally ill.

10(b): Applicant's plea of guilty was rendered involuntarily, in violation of the rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and by Article I, §§ 12 and 14 of the South Carolina Constitution, because trial counsel informed him, and apparently without any factual basis, that the trial court judge promised to impose Life sentences in exchange for the guilty pleas.

11(b): Applicant pleaded guilty to two counts of capital murder because trial counsel informed him the trial court judge would impose Life sentences.

10(c): Applicant's plea of guilty was rendered involuntarily, in violation of the rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and by Article I, §§ 12 and 14 of the South Carolina Constitution, because of the inherently coercive effect of the trial judge's involvement in plea negotiations.

11(c): The trial court judge was extremely involved in the disposition of this case, engaging in numerous ex parte contacts with the parties, and with the intention of having Applicant plead guilty to two counts of capital murder.

10(d): Applicant received ineffective assistance of appellate counsel, in violation of the rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments and by Article I, §§ 3 and 14 of the South Carolina Constitution, because appellate counsel failed to raise the issue that Applicant's guilty plea was involuntary due to the inherently coercive effect of the trial judge's involvement in plea negotiations.

11(d): The inherently coercive effect of the trial judge's involvement in plea negotiations was apparent to appellate counsel, and sufficiently raised in the Motion to Vacate Guilty Plea, and appellate counsel was ineffective for [not] raising the issue on direct appeal.

App. 3275–76.

The State made a timely return and the Honorable R. Ferrell Cothran, Jr., Circuit Court Judge, was assigned to the case. App. 3280–306. After Petitioner attempted to waive his PCR proceeding, Judge Cothran ordered Petitioner to undergo a competency evaluation. On January 15, 2014, Judge Cothran conducted a competency hearing, at which Dr. Richard Frierson opined Petitioner was competent to proceed with his PCR action and Petitioner withdrew his request to

waive his appellate rights. App. 3421–47. Accordingly, Judge Cothran found Petitioner competent to proceed. *Id.* However, on February 2, 2014, Petitioner attempted suicide and, shortly thereafter, began spreading false information in an attempt to sabotage his case. App. 4259. Thus, PCR counsel moved for the court to appoint Petitioner a guardian. App. 4258–60. On April 10, 2014, Judge Cothran granted counsels' motion and appointed Diana Holt as guardian. *Id.*

Judge Cothran held evidentiary hearings on November 17–18, 2014, and March 30, April 1, and April 10, 2015. App. 3486–4017. On December 1, 2015, Judge Cothran dismissed Petitioner's application and denied PCR relief. App. 4199–257.[3] Petitioner moved to alter or amend the court's order and, on March 31, 2016, after briefing by the State, Judge Cothran denied Petitioner's motion. App. 4261–4311.

### PCR Appeal

Franklin-Best and Young continued to represent Petitioner on appeal and raised the following issues in Petitioner's Amended Petition for Writ of Certiorari:

> I.     Was Quincy Allen's guilty plea involuntary, in violation of the rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and by Article I, Sections 12 and 14 of the South Carolina Constitution because the trial court judge indicated to trial counsel that he would impose a life sentence in exchange for Allen's pleading guilty to two counts of capital murder and Allen relied on that [] assurance when he pleaded guilty?

> II.    Did trial counsel render ineffective assistance of counsel when they urged their client to forfeit his right to a jury trial without obtaining adequate assurances from the trial court judge that he would impose a life sentence, in violation of Allen's rights under the Sixth and Fourteenth Amendments

---

[3] This copy of the PCR order is partially illegible. For the remainder of this order, the Court will cite to the copy Petitioner submitted to the Supreme Court of South Carolina with his Petition for Writ of Certiorari, available at ECF No. 22-2.

to the United States Constitution and by Article I, Sections 3 and 14 of the South Carolina Constitution?

III.     Did trial counsel render ineffective assistance of counsel, in violation of Allen's rights under the Sixth and Fourteenth Amendments to the United States Constitution and by article I, Sections 3 and 14 of the South Carolina Constitution when they encouraged Quincy Allen to plead guilty and when Judge Cooper did not indicate he would sentence him to life sentences because Richland County juries historically do not impose the death penalty and a jury would not have sentenced Allen to death?

IV.     Did trial counsel render ineffective assistance of counsel, in violation of Allen's rights under the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 3 and 14 of the South Carolina Constitution, when they failed to present available and highly mitigating evidence of Quincy Allen's horrendously abusive and neglectful childhood?

V.     Did trial counsel render ineffective assistance of counsel, in violation of Allen's rights under the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 3 and 14 of the South Carolina Constitution, when they failed to present readily available and compelling evidence of Allen's mental illness that would have rebutted the State's claim, and that Judge Cooper appears to have credited, that Allen malingered his mental illness?

VI.     Did trial counsel render ineffective assistance of counsel, in violation of Allen's rights under the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 3 and 14 of the South Carolina Constitution, when they failed to object to the trial judge's confusing the competency to be executed standard with the standard for finding Allen to be mentally ill?

VII.     Did trial counsel render ineffective assistance of counsel, in violation of Allen's rights under the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 3 and 14 of the South Carolina Constitution, by failing to elicit any execution impact evidence during the sentencing hearing when that evidence would have resulted in the judge's imposing a life sentence?

ECF No. 22-6 at 9–10. On April 19, 2018, after briefing by the State and a reply from Petitioner,

the Supreme Court of South Carolina denied Petitioner's petition on the merits. ECF No. 22-9.

8

Petitioner sought rehearing, ECF No. 22-10, which the court denied, ECF No. 22-11. The Supreme Court of South Carolina issued the remittitur on May 25, 2018, and it was filed on May 29, 2018. ECF No. 22-12.

***Federal Habeas Corpus Action***

Petitioner timely commenced this federal habeas corpus action on May 25, 2018. ECF No. 1. On May 15, 2019, Petitioner filed an amended petition[4] for habeas corpus and raises the following grounds for relief:

> I.      Mr. Allen's Sixth, Eighth, and Fourteenth Amendment rights were violated where the judge sentenced him to death without finding that the statutory aggravating factors were proven beyond a reasonable doubt.
>
> II.     Mr. Allen's rights under the Sixth, Eighth, and Fourteenth Amendments were violated because the trial judge failed to find that any mitigating circumstance had been established and used an impermissibly high standard for determining whether Mr. Allen suffered from mental illness; Trial Counsel ineffectively failed to object to the judge's failure to appropriately consider and give effect to relevant mitigating evidence.
>
> III.    The sentencing judge's reliance on the deterrent effect a sentence of death might have on other abusive mothers violated the Eighth Amendment's

---

[4] In its Order appointing counsel, the Magistrate Judge directed Petitioner to file a "placeholder petition" within 90 days of the order appointing counsel. ECF No. 13 at 6. The Magistrate Judge further ordered that Petitioner would "then have until the expiration of the one[-]year limitation period prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA') to amend his petition." *Id.* This practice has been used in this District to prevent the State of South Carolina from moving forward with an execution prior to the expiration of a petitioner's one-year statute of limitations under AEDPA. Such a procedure is necessary because federal law permits a federal court to stay execution of a death sentence for no longer "than 90 days after counsel is appointed" and *after* a federal habeas petition is actually filed. 28 U.S.C. §§ 2251(a)(1), (a)(3). However, there does not appear to be a mechanism by which a federal court can stay an execution during the period (of up to nine months) when a petitioner is researching and drafting a petition after the 90-day stay expires. This is further complicated by the Supreme Court of South Carolina's ruling in *In re Stays of Execution in Capital Cases*, which makes clear that "[a]ny request for a stay pending federal habeas corpus proceedings should be made to the federal court." 471 S.E.2d 140, 142 (S.C. 1996).

protection against the consideration of an arbitrary factor in determining the penalty.

IV.  Mr. Allen's guilty plea was not knowing, intelligent, and voluntary, in violation of the rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments because Mr. Allen did not understand the significance and the consequences of deciding to plead guilty due to the medication he was taking; Trial Counsel was ineffective in failing to ensure Mr. Allen's plea was knowing, intelligent, and voluntary.

V.   Trial Counsel were ineffective in violation of Mr. Allen's rights under the Sixth and Fourteenth Amendments because they advised him to plead guilty without adequate assurances from the judge.

VI.  Mr. Allen's guilty plea was involuntary, in violation of the rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments, because the trial judge indicated to counsel that he would impose a life sentence if Mr. Allen pled guilty to two counts of capital murder and Mr. Allen relied on that assurance in pleading guilty.

VII. Trial Counsel were ineffective in violation of Mr. Allen's rights under the Sixth and Fourteenth Amendments when they failed to present available and compelling mitigation evidence.

VIII. South Carolina Code § 16-3-20(B) violates the Sixth, Eighth and Fourteenth Amendments because it requires capital defendants to plead not guilty to exercise their right to a jury sentencing.

IX.  Petitioner is entitled to relief from his conviction and sentence because of the prejudicial effects of the cumulative errors in this case.

ECF No. 39.

## APPLICABLE LAW

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id.* at 327. To that end, Rule 56 states "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

*Habeas Corpus*

Petitioner's claims are governed by 28 U.S.C. § 2254(d), which provides that his petition cannot be granted unless the claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Importantly, "a determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

<u>*Procedural Bypass*</u>

Procedural bypass, sometimes referred to as procedural bar or procedural default, is the doctrine applied when a petitioner seeks habeas corpus relief based on an issue he failed to raise at the appropriate time in state court, removing any further means of bringing that issue before the state courts. In such a situation, the petitioner has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition. *See Smith v. Murray*, 477 U.S. 527, 533 (1986). The United States Supreme Court has stated that the procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts.

*Id.* Bypass can occur at any level of the state proceedings if a state has procedural rules that bar its courts from considering claims not raised in a timely fashion. *Id.*

The Supreme Court of South Carolina will refuse to consider claims raised in a second application for PCR that could have been raised at an earlier time. *See* S.C. Code Ann. § 17-27-90; *Aice v. State*, 409 S.E.2d 392, 394 (S.C. 1991). Further, if a prisoner has failed to file a direct appeal or a PCR application and the deadlines for filing have passed, he is barred from proceeding in state court. S.C. App. Ct. R. 203(d)(3), 243. If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. *See Reed v. Ross*, 468 U.S. 1, 11 (1984); *see also Kornahrens v. Evatt*, 66 F.3d 1350, 1357 (4th Cir. 1995). As the Supreme Court of the United States explained:

> [State procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

*Reed*, 468 U.S. at 10–11.

However, if a federal habeas petitioner can show both (1) "'cause' for noncompliance with the state rule" and (2) "'actual prejudice resulting from the alleged constitutional violation[,]'" the federal court may consider the claim. *Smith*, 477 U.S. at 533 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). When a petitioner has failed to comply with state procedural requirements and cannot make the required showing of cause and prejudice, the federal courts generally decline to hear the claim. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Further, if the petitioner does not raise cause and prejudice, the court need not consider the defaulted claim. *See Kornahrens*, 66

F.3d at 1363.

If a federal habeas petitioner has failed to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts and in federal court. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). Absent a showing of cause and actual prejudice, a federal court is barred from considering the claim. *Wainwright*, 433 U.S. at 87. In such an instance, the exhaustion requirement is technically met, and the rules of procedural bar apply. *Teague v. Lane*, 489 U.S. 288, 298 (1989).

### *Cause and Actual Prejudice*

Because the requirement of exhaustion is not jurisdictional, this Court may consider claims that have not been presented to the Supreme Court of South Carolina in limited circumstances— where a petitioner shows sufficient cause for failure to raise the claim and actual prejudice resulting from the failure, *Coleman*, 501 U.S. at 750, or where a "fundamental miscarriage of justice" has occurred, *Carrier*, 477 U.S. at 495–96. A petitioner may prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim, where the novelty of the constitutional claim is such that its legal basis is not reasonably available to the petitioner's counsel. *Id.* at 487–89; *Reed*, 468 U.S. at 16. Absent a showing of "cause," the court is not required to consider "actual prejudice." *Turner v. Jabe*, 58 F.3d 924, 931 (4th Cir. 1995). However, if a petitioner demonstrates sufficient cause, he must also show actual prejudice to excuse a default. *Carrier*, 477 U.S. at 492. To show actual prejudice, the petitioner must

demonstrate more than plain error. *Engle v. Isaac*, 456 U.S. 107, 134–35 (1982).

As an alternative to demonstrating cause for failure to raise the claim, the petitioner must show a miscarriage of justice. To demonstrate a miscarriage of justice, the petitioner must show he is actually innocent. *See Carrier*, 477 U.S. at 496 (holding a fundamental miscarriage of justice occurs only in extraordinary cases, "where a constitutional violation has probably resulted in the conviction of someone who is actually innocent"). Actual innocence is defined as factual innocence, not legal innocence. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this actual innocence standard, the petitioner's case must be truly extraordinary. *Carrier*, 477 U.S. at 496.

### Ineffective Assistance of Counsel

To challenge a conviction or sentence based on ineffective assistance of counsel, a petitioner must prove two elements: (1) his counsel's representation was deficient and (2) he was prejudiced as a result of counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the first prong, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "[B]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

To satisfy the second prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 692. Where a petitioner contests his decision to plead guilty due to ineffective assistance of counsel, he must show that "there is a reasonable probability that, but for counsel's

15

errors, [he] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

## DISCUSSION

All of Petitioner's grounds for relief are preserved, except Ground Four, part of Ground Seven, and Ground Nine's allegation of cumulative error. The Court will address the preserved grounds first.

### *Preserved Claims*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief unless the underlying state court decision was contrary to or an unreasonable application of federal law, as determined by the United States Supreme Court, 28 U.S.C. § 2254(d)(1), or based on an unreasonable determination of the facts before the court, *id.* § 2254(d)(2). The Supreme Court has held the "contrary to" and "unreasonable application of" clauses present two different avenues for relief. *Williams*, 529 U.S. at 405 ("The Court of Appeals for the Fourth Circuit properly accorded both the 'contrary to' and 'unreasonable application' clauses independent meaning."). The Court stated there are two instances when a state court decision will be contrary to Supreme Court precedent:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

*Id.* at 405–06. On the other hand, a state court decision is an unreasonable application of Supreme

Court precedent when the decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08; *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011) ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. . . . It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). Finally, a decision cannot be contrary to or an unreasonable application of Supreme Court precedent unless applicable Supreme Court precedent exists; without applicable Supreme Court precedent, there is no habeas relief for petitioners. *Virsnieks v. Smith*, 521 F.3d 707, 716 (7th Cir. 2008) (citing *Lockhart v. Chandler*, 446 F.3d 721, 724 (7th Cir. 2006)); *Simpson v. Battaglia*, 458 F.3d 585, 597 (7th Cir. 2006)); *see Bustos v. White*, 521 F.3d 321, 325 (4th Cir. 2008).

### *Ground One*

In Ground One, Petitioner asserts the trial judge erred in (1) sentencing Petitioner to death without finding the existence of specific aggravating factors and (2) failing to find any aggravating factors proven beyond a reasonable doubt. *See* ECF No. 39 at 41–43. Petitioner contends these errors were structural in nature and violated his Sixth, Eighth, and Fourteenth Amendment rights. *Id.*

Judge Cooper made specific findings concerning the aggravating factors at the close of the State's case. The State sought to prove seven enumerated aggravating factors concerning Dale Hall's murder: (1) the murder was committed while in the commission of a kidnapping, (2) the

murder was committed while in the commission of a robbery with a deadly weapon, (3) the murder was committed while in the commission of a larceny with a deadly weapon, (4) the murder was committed while in the commission of physical torture, (5) the defendant had a prior conviction for murder, (6) the defendant committed at least two murders pursuant to one scheme or course of conduct, and (7) the murder was committed while in the commission of dismemberment of the victim. App. 2952–53. Regarding the murder of Jedidiah Harr, the State sought to show (1) the defendant had a prior conviction for murder, (2) the murder was committed by the defendant who by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which normally would be hazardous to the lives or more than one person, and (3) the defendant committed at least two murders pursuant to one scheme or course of conduct. App. 2951.

After the State concluded its penalty phase case, trial counsel moved for a directed verdict on all of the State's proffered aggravating circumstances, asserting "there ha[d] been insufficient evidence presented by the State to satisfy the prevailing legal definitions in South Carolina of these particular statutory aggravating circumstances." App. 0880–81. Regarding Dale Hall's murder, Judge Cooper denied counsels' motion and thus found the State made a sufficient showing as to five of the statutory aggravators. App. 0879–86. With regard to the State's first statutory aggravator—the murder was committed while in the commission of a kidnapping—Judge Cooper found "specifically that the State ha[d] made a sufficient showing of that aggravating circumstance beyond a reasonable doubt." App. 0881. Judge Cooper further denied trial counsels' motion on two of the State's statutory aggravators for Jedidiah Harr's murder. App. 0886–88.

After ruling on each statutory aggravator, Judge Cooper stated, "[t]herefore, pursuant to

Section 16-3-20, this trial will continue. Having found statutory aggravating circumstances enumerated by the statute, this trial shall continue to the mitigation phase of the trial." App. 0888–89.

Petitioner's trial counsel presented their mitigation case and then renewed their directed verdict motions, which Judge Cooper denied. App. 0926–1969. The State presented several reply witnesses before resting. App. 1972–2437. Despite being provided the opportunity to do so, the defense did not call any additional witnesses. App. 2436–37.

After closing arguments, Judge Cooper announced his sentencing decision, stating in relevant part:

> I find that, pursuant to 16-3-20 of the Code of Laws of South Carolina, the death penalty is warranted under the evidence of this case and is not the result of prejudice, passion, or any other arbitrary factor.
>
> . . . .
>
> After carefully considering all relevant facts and circumstances, including the existence of statutory aggravating circumstances as well as the claim of mitigating circumstances, this Court finds and concludes that the defendant shall be sentenced to death by electrocution or lethal injection as set forth in South Carolina Code Annotated Section 24-3-530.

App. 2553–54.

In a sentencing report dated April 1, 2005, several weeks after the conclusion of the penalty phase, Judge Cooper memorialized his sentence and noted he found the following statutory aggravating circumstances and that those circumstances were supported by the evidence:

> Victim Dale Hall: Kidnapping, Larceny with use of a deadly weapon, Physical torture, murder committed by person with prior conviction for murder
>
> Victim Jedediah Harr: Murder committed by person with prior conviction for murder, knowingly creating a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to more

than one person.

App. 2960–62.

In addressing this issue on direct appeal, the Supreme Court of South Carolina relied on

Judge Cooper's sentencing report and remarks at the close of the penalty phase and found:

> Accordingly, Allen's contention that the trial court failed to set forth specific statutory aggravating circumstances is meritless and the sentence was imposed in compliance with S.C. Code § 16-3-20(C). *State v. Chaffee*, 285 S.C. 21, 328 S.E.2d 464 (1984), *overruled on other grounds State v. Torrence*, 317 S.C. 45, 451 S.E.2d 883 (1994) (death penalty may be imposed upon finding at least one statutory aggravating factor).

*Allen*, 687 S.E.2d at 24–25.

Petitioner asserts the state court's ruling is an unreasonable determination of the facts and

an unreasonable application of *Ring v. Arizona*, 536 U.S. 584 (2002), and *Chambers v. Mississippi*,

410 U.S. 284 (1973). ECF No. 63 at 26. Petitioner argues, under *Chambers*, he had the right to

present his defense before the trial court found the existence of any statutory aggravating

circumstances and, in violation of *Ring*, Judge Cooper failed to find any statutory aggravating

circumstances proven beyond a reasonable doubt. ECF No. 63 at 21, 26. In addition, Petitioner

asserts to the extent the state court decision is based on a factual finding that Judge Cooper found

specific statutory aggravators proved beyond a reasonable doubt after Petitioner presented his case,

the decision is based on an unreasonable determination of the facts and is directly contradicted by

the record. ECF No. 63 at 26.

The Court finds all of Petitioner's arguments lack merit. First, Petitioner was not deprived

of an opportunity to present evidence in his own defense, nor did his presentation of that evidence

after Judge Cooper found the existence of statutory aggravators violate his constitutional rights.

As the Supreme Court of the United States has explained:

> Since *Furman v. Georgia*, we have required States to limit the class of murderers to which the death penalty may be applied. This narrowing requirement is usually met when the trier of fact finds at least one statutorily defined eligibility factor at either the guilt or penalty phase. Once the narrowing requirement has been satisfied, the sentencer is called upon to determine whether a defendant thus found eligible for the death penalty should in fact receive it.

*Brown v. Sanders*, 546 U.S. 212, 216–17 (2006) (citations omitted). That is the procedure Judge Cooper followed in Petitioner's case and Petitioner has not offered reason to doubt its constitutionality.

Second, as detailed above, Judge Cooper stated on the record that he found the State had proven the first statutory aggravating factor related to Dale Hall's murder beyond a reasonable doubt. *See* App. 0881. Judge Cooper further specifically denied trial counsels' motions for directed verdict on four other statutory aggravating factors applicable to Dale Hall's murder and two statutory aggravating factors relating to Jedidiah Harr's murder, thus finding the State had proven the existence of those factors. *See* App. 0880–88. And in making his findings, Judge Cooper twice referenced S.C. Code Ann. § 16-3-20, which requires the finding of a statutory aggravating circumstance beyond a reasonable doubt before a death sentence may be imposed. *See* App. 0888–89, 2553; S.C. Code Ann. § 16-3-20(A). Thus, the record supports the state court's finding that Judge Cooper applied the correct standard and found at least one statutory aggravating circumstance proven beyond a reasonable doubt with respect to each murder. *See Wainwright v. Witt*, 469 U.S. 412, 431 (1985) ("As we have stated on other occasions, . . . where the record does not indicate the standard applied by a state trial judge, he is presumed to have applied the correct one."); *United States v. Hunt,* 794 F.2d 1095, 1100 (5th Cir. 1986) ("[Defendant] argues nevertheless that a fair trial can occur only if the judge utters the magic words 'with bad purpose.' For us to require certain ways of defining terms . . . without our reviewing the entire charge,

without our inquiring into all circumstances of the trial, would promote shallow form over substance. We emphatically refuse to straightjacket the district courts' discretion in instructing juries because a criminal defendant raises some abstract semantical debate.").

For these reasons, Petitioner fails to show the state court's decision was an unreasonable application of established Supreme Court precedent or based on an unreasonable determination of the facts and has not shown entitlement to habeas relief on Ground One.

*Ground Two*

In Ground Two, Petitioner alleges violations of his Sixth, Eighth, and Fourteenth Amendment rights because (1) Judge Cooper failed to find the existence of any mitigating circumstance, (2) Judge Cooper used an impermissibly high standard for determining whether Petitioner suffered from mental illness, and (3) Petitioner's trial counsel were ineffective for failing to object to Judge Cooper's failure to appropriately consider and give effect to relevant mitigating evidence. ECF No. 39 at 43. Petitioner raised and properly exhausted this claim in this PCR application and on PCR appeal.

Petitioner's argument again focuses on Judge Cooper's oral sentencing order. He contends, despite trial counsels' presentation of mostly undisputed evidence of Petitioner's childhood trauma and abuse and longstanding history of mental illness, Judge Cooper failed to discuss Petitioner's life history during sentencing and focused solely on whether Petitioner was mentally ill at the time he committed the crimes or at the time of trial. ECF No. 39 at 43–55. The record rebuts these assertions.

Judge Cooper began his sentencing order by recognizing the importance of Petitioner's mental health evidence: "In the case of The State vs. Quincy Jovan Allen, this is a difficult case.

Because of the far-reaching mental health implications of this decision, it is significant to our society and our community." App. 2527. After recognizing the case's significance to others who were impacted by Petitioner's crimes and by the trial itself, Judge Cooper described the evidence before him:

> In considering the outcome of this sentencing hearing I have tried to understand the unique forces and events which have put Mr. Allen in the situation in which he finds himself today. I have considered his upbringing so masterfully chronicled by Debra [sic] Grey. I've considered his list of mental illness[es] as described by Dr. Pam Crawford.

> I've considered the facts of the various murders that Mr. Allen does not deny. I've considered the impact to James White, to Dale Hall's family and to the Harr family. I've also considered the effect of this trial on Quincy Allen's two younger brothers who have sat through the majority of this trial. And I have considered the passionate arguments of counsel on both sides of this case.

> I have further considered the North Carolina proceedings and the defendant's prior motion to bar the State from contesting Mr. Allen's mental illness due to the findings of Judge Martin in that case. I wish to state for the record that this proceeding has been completely different from the one in North Carolina.

> In North Carolina, a plea agreement was entered into by both the State and the defendant, the terms of which were that Mr. Allen would be sentenced to two life without parole sentences by Judge Martin in exchange for Mr. Allen's guilty plea. That was not a sentencing hearing as this has been. During the North Carolina sentencing hearing no death penalty was sought. No contesting witnesses were called by the State. I am hesitant to speculate, but I suspect that that hearing was not in the least comparable to the one we have experienced in the last two weeks. I, therefore, affirm my earlier decision not to be bound by the North Carolina court's decisions.

> Mr. Allen raises the issue of mental illness as his reason for avoiding the death penalty. His attorneys argue that due to his diagnosed mental illness his culpability was diminished and no retributive or deterrent effect would be served by the imposition of the death penalty.

> Addressing the issue of mental illness, I have not seen convincing evidence that Mr. Allen had a major mental illness at the time of the crimes in 2002. I have seen a series of short-stay hospitalizations from 1997, 1998 and 1999, but no recognition of a mental illness that required or demanded a treatment program.

If he had a major mental illness in 1997 or 1998 or 1999, then the mental illness community failed him and failed this community. His sole form of treatment was to give him some pills and send him away. This leads me to believe that his mental condition and behavior were primarily a reaction to a very poor and destructive home life as a child from which he chose to act out in ways that would garner attention for himself, whether by being annoying, or childish or aggravating.

His subsequent actions of attempting to kill James White and ultimately killing Dale Hall were, I believe, a result of his desire to be noticed and respected. And if he had a major mental illness at that time in 2002, no one, not even his psychiatrists, were aware of it.

Add to this his casual, if not happy, conversations with Tia Brown immediately after killing two people in North Carolina and his remarkably calm descriptions to Agent Lloyd Terry on August 15th, 2002, immediately after his capture in great detail of the crimes that he had just committed.

These lead me to believe that if indeed he had schizophrenia, it was not evident and the disease did not control his mind to such a degree as to exonerate or lessen the culpability of his actions.

And what is Mr. Allen's condition today? I have listened to and read the accounts of all of the psychiatrists and psychologists in this case: Doctors Hilkey, Gupta, Lavin, DeBeck, Hattem, Crawford, Mirza, Tezza, Corvin and Schwartz-Watts.

Quite frankly, I cannot tell with certainty what his mental state is today. I know he is on medication. I have observed him sitting quietly at counsel table, making notes, reading a dictionary, and not exhibiting any unusual or bizarre behavior. I have noticed him communicating with counsel and on occasion, smiling. He has always had a neat and well-groomed appearance.

Yet, three respected psychiatrists, Dr. Corvin, Dr. Crawford, and Dr. Schwartz-Watts have testified that as he sits here today he has a major mental illness characterized by delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms, such as affective flattening, alogia, or avolition. And maybe he does, although his outward appearance belies such a condition.

On the other hand, I have heard Dr. DeBeck and Dr. Hattem say that in August 2003, their diagnosis was that he was malingering. Dr. DeBeck, a psychiatrist at the Dorothea Dix Hospital in North Carolina, on August 29th, 2003, after a thorough evaluation said, "Mr. Allen did not show symptoms of a psychiatric disorder during his hospital stay, despite being off antipsychotics since April 11th,

2003."

Dr. Tezza and Dr. Mirza also testified that on December 3rd, 2004, they found that Mr. Allen was malingering when sent to Just Care by the Richland County Detention Center.

. . . .

These contrary opinions lead me to no firm conclusions as to Mr. Allen's mental state at this time.

App. 2527–33.

Judge Cooper then cited *Ake v. Oklahoma*, 470 U.S. 68 (1985), for the proposition that "because 'psychiatrists disagree widely and frequently on what constitutes mental illness and on the appropriate diagnosis to be attached to given behavior and symptoms,' the fact finder must resolve differences in opinion within the psychiatric profession 'on the basis of the evidence offered by each party' when a defendant's sanity is at issue in a criminal trial." App. 2533–34 (quoting *Ake*, 470 U.S. at 81). He went on to discuss Supreme Court decisions banning capital punishment for the mentally incompetent, insane, and youth under eighteen years old, and specifically the Court's reliance on the lack of deterrent or retributive effect on those categories of offenders. App. 2534–37 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002); *Roper v. Simmons*, 543 U.S. 551 (2005); *Ford v. Wainwright*, 477 U.S. 399 (1986)). Judge Cooper then recited South Carolina's two-prong test for determining whether a defendant is competent to be executed, but stated he relied on that authority "as a guide" because of "the lack of guiding principles dealing with the imposition of the death penalty on persons with mental illness." App. 2538, 2548 (quoting *Singleton v. State*, 437 S.E.2d 53, 58 (S.C. 1993)). He concluded Petitioner was competent under *Singleton*'s test but did not end his analysis there. App. 2548.

Judge Cooper then wrestled with whether Petitioner's actions were driven by fate, mental

illness, or free will before concluding:

> Mr. Allen set out on a journey sometime in 2002 to become a serial killer. The force that determined whether he would accomplish that goal was in his own mind, his own intelligence, his own will, a will that his doctors tell us now was not free.

App. 2548–51. In addition, Judge Cooper asked whether he should consider Petitioner's prior declarations of his desire and intent to murder more people or whether those statements resulted from mental illness. App. 2551. Judge Cooper returned to his consideration of deterrence and retribution before finally announcing Petitioner's sentence. App. 2552–53.

In his PCR application, Petitioner framed this claim as an assertion that trial counsel were ineffective for "failing to object to the trial court's confusing of the competency to be executed standard with the standard for finding mental illness." ECF No. 22-2 at 53. In denying this claim, the PCR court found:

> [C]ounsel was not deficient in failing to object to Judge Cooper's statement where he discussed the failure to show that he met the standards of competency to be executed because it does not indicate that Judge Cooper declined to consider the mitigation evidence as presented. Rather the [sentencing] order expresses a conclusion that Judge Cooper did not give the evidence of mental illness the weight that Applicant wanted him to give. Since consideration of the evidence was properly given, counsel could not be deemed ineffective for failing to object. The suggestion that Judge Cooper confused the concept with guilty but mentally ill, a guilt phase issue, is not persuasive. The transcript is more fairly read to reflect a global assessment of the facts and circumstances before the sentencing judge, which he considered, weighed and narrowed, until arriving at his sentencing conclusion. Applicant has not persuaded this Court that the sentencing court confused the competency to be executed standard with the standard for finding mental illness. As such, the Applicant has failed to establish either prong of *Strickland*.

ECF No. 22-2 at 54.

Petitioner contends that, because he presented a large amount of mitigating evidence, much of which was uncontested, and Judge Cooper failed to find the existence of any mitigating

circumstances, Judge Cooper could not have possibly considered, weighed, or given effect to all of the relevant mitigating evidence as required by *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Lockett v. Ohio*, 438 U.S. 586 (1978); and *Eddings v. Oklahoma*, 455 U.S. 104 (1981). ECF No. 63 at 34. Thus, Petitioner asserts the PCR court's contrary conclusion is based on an unreasonable determination of the facts and represents an unreasonable application of *Woodson*, *Lockett*, and *Eddings*. *Id.*

Under *Woodson*, *Lockett*, and *Eddings*, a jury or sentencing court may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original). Moreover, the sentencing authority "may determine the weight to be given relevant mitigating evidence," "[b]ut it may not give [this evidence] no weight by excluding such evidence from [its] consideration." *Eddings*, 455 U.S. at 114–15.

Thus, the Constitution does not require a capital sentencer to find the existence of a mitigating factor, only to consider all of the evidence offered in mitigation. Here, Judge Cooper explicitly stated he considered the evidence of Petitioner's abusive childhood and alleged mental illness in reaching his decision. He went on to discuss some of that evidence in detail and describe how he assessed it. Judge Cooper's decision to grant that evidence little weight does not rebut the record's clear indication that he did, in fact, consider it.

Accordingly, Petitioner fails to show the PCR court's ruling is contrary to, or an unreasonable application of, clearly established federal law or is based on an unreasonable determination of the facts. Respondent's Motion for Summary Judgment is granted as to Ground

Two.

<u>*Ground Three*</u>

In Ground Three, Petitioner alleges Eighth and Fourteenth Amendment violations because Judge Cooper considered an arbitrary factor—the potential deterrent effect on other abusive mothers—in reaching his sentencing decision. ECF No. 39 at 56–59. Petitioner properly exhausted this claim on direct appeal and asserts the state court's denial is based on an unreasonable determination of the facts and unreasonably applies established Supreme Court precedent requiring an individualized sentence. ECF No. 63 at 35–39.

Much of Petitioner's penalty phase evidence focused on his traumatic childhood, including the abuse he suffered by his own mother. *See, e.g.*, App. 1069–72 (describing 19-month-old Petitioner's referral to protective services because his mother "had other things on her mind" and failed to treat his fever, which turned into pneumonia); App. 1073–75 (describing the violence Petitioner's stepfather inflicted on Petitioner and his mother); App. 1093–95 (describing other extreme incidents of Petitioner's mother abusing him); App. 1111–12 (Petitioner's mother withheld basic food and shelter as punishment); App. 2094 (Petitioner's mother used to throw him in a trashcan, beat him with a belt, and lock him in a closet). Trial counsel's closing statement, the last argument Judge Cooper heard before announcing Petitioner's sentence, further emphasized that evidence and its relevance to Petitioner's defense. App. 2514–25.

As discussed in Ground Two, Judge Cooper's sentencing order highlighted the concepts of retribution and deterrence as guiding factors in the Supreme Court's capital punishment jurisprudence. Judge Cooper defined retribution as "the interest in seeing that the offender gets his 'just deserts,'" and stated "the severity of the appropriate punishment necessarily depends on

the culpability of the offender." App. 2534 (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)). Importantly, again citing *Atkins*, Judge Cooper defined deterrence as "the interest in preventing capital crimes by prospective offenders," and noted the Court's observation that "capital punishment can serve as a deterrent only when the murder is a result of premeditation and deliberation." App. 2535.

Judge Cooper discussed some of the crueler aspects of Petitioner's crimes in assessing Petitioner's claims of mental illness and then returned to his consideration of retribution and deterrence as applied to Petitioner's case. App. 2549–52. Judge Cooper found both concepts applicable, stating:

> Retribution in a sense is the easiest. Considering the fear Mr. Allen struck into the heart of James White and the subsequent shooting of James White for practice, I find retribution appropriate.
>
> Considering the fear Mr. Allen struck into the heart of Dale Hall, the absolute depravity of her murder, and the subsequent burning of her body, I find retribution appropriate.
>
> Considering the callous killing of Jedediah Harr and the subsequent stalking of Brian Marquis for the purpose of killing him, I find retribution appropriate.
>
> And how could Quincy Allen's death serve as a deterrent to others, to the abused and neglected young people of this community? Maybe it will make some young man or some young girl stop and think about the results of destructive behavior.
>
> Hopefully, hopefully, it will make some young mother, single or otherwise, think about the love and care that children need, no matter how tough the circumstances, and would deter that mother from making the same horrible choices made with Quincy Allen. I would hope that this sentence has at least that deterrent effect, but we may never know.

App. 2552–53. It is this last paragraph that forms the basis of Petitioner's claim.

Considering this claim on direct appeal, the Supreme Court of South Carolina cited the relevant precedent requiring sentencing phase evidence to relate to the defendant's character or the

circumstances of the crime, listing retribution and deterrence as justifications supporting imposing the death penalty, and allowing admission of general deterrence evidence in the penalty phase of a capital trial. App. 3269 (citing, e.g., U.S. Const. amend. 8; *Gardner v. Florida*, 430 U.S. 349 (1977); *Beck v. Alabama*, 447 U.S. 625 (1980); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Enmund v. Florida*, 458 U.S. 782 (1982); *State v. Shuler*, 577 S.E.2d 438 (S.C. 2003)).

The Supreme Court of South Carolina found as follows:

It is clear from reading the entirety of the trial court's sentencing order, along with the written sentencing report, that the death sentence was based upon the characteristics of Allen and the circumstances of the crime, such that the penalty is warranted . . . .

. . . .

We do not find the trial court's imposition of the death sentence in this case to be the result of any arbitrary factor. In reading the entirety of the court's colloquy, it is clear that the sentence was premised primarily on retribution to this particular defendant, and the fact that the murders were deliberate, premeditated and cruel. The trial court commented on the way Allen put a shotgun to Dale Hall's mouth and pulled the trigger, then went to the gas station, bought gas, and went back and burned her body. He commented on the fact that Allen changed the load in his shotgun to hollow point slugs to make it more destructive. He commented on the fact that it was Allen's intention to become a serial killer in order to garner respect. He commented on the fact that Allen told people he would kill again if given the opportunity. He commented on the fact that Allen then left the state and went and committed more murders in North Carolina.

Notwithstanding the trial court's isolated comment concerning deterrence to abusive parents, it is patent the sentence does not rest on this ground and was not imposed due to an arbitrary factor. Accordingly, the sentence is affirmed.

*Allen*, 687 S.E.2d at 24.

Petitioner argues, "[t]o the extent that the state court ruled that deterring other mothers from abusing their children is not an 'arbitrary factor,' that decision is contrary to and an unreasonable application of" Supreme Court precedent requiring an individualized sentencing, related to the

defendant's character and the circumstances of the crime. ECF No. 63 at 38. While the Court agrees that basing a death sentence on its potential deterrent effect on abusive mothers could be arbitrary and capricious in some circumstances, Petitioner has not shown that to be the case here.

The crux of the issue here is whether and to what degree Judge Cooper actually relied on the potential deterrence of abusive mothers in reaching his sentencing decision. Petitioner insists the record clearly disputes the state court's finding that Petitioner's sentence did not rest on this factor and points to Judge Cooper's discussion of deterrence and retribution as controlling considerations. ECF No. 63 at 38.

Under 28 U.S.C. § 2254(d)(2), a federal court may not grant Petitioner relief on a claim already adjudicated on the merits in state court unless the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In considering such a claim, the Court must presume the correctness of any "determination of a factual issue made by the State court" and Petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).

While Petitioner clearly disagrees with the state court's finding, he has not shown that finding to be unreasonable. The record before the state court suggests Judge Cooper properly considered the retributive and deterrent effect of Petitioner's sentence. Judge Cooper clearly

emphasized retribution in this case, but also noted a potential deterrent effect on possible future offenders. *See* App. 2552 ("And how could Quincy Allen's death serve as a deterrent to others, to the abused and neglected young people of this community? Maybe it will make some young man or some young girl stop and think about the results of destructive behavior."). In context, Judge Cooper's brief mention of a "hopeful" deterrent effect on abusive mothers is reasonably read as a response to the abundant evidence before him of Petitioner's horrible, abusive childhood, and not as a basis for his sentencing decision.

Accordingly, Petitioner fails to show the state court based its decision on an unreasonable factual determination; thus, the Court grants Respondent's Motion for Summary Judgment as to Ground Three.

### Grounds Five & Six

In Grounds Five and Six, Petitioner contends he involuntarily pled guilty due to trial counsels' bad advice (Ground Five), which they based on an indication from Judge Cooper that he would not impose the death penalty if Petitioner pled guilty (Ground Six). *See* ECF No. 39 at 71–89. Petitioner's assertions in these two grounds were hotly contested during the PCR proceedings, accounting for the bulk of the testimony and final PCR order.

#### *Relevant Background*

The following facts are uncontested. At some point prior to Petitioner's guilty plea, defense counsel asked Dr. Crawford to meet with Richland County Solicitor Barney Giese, with whom she had a good working relationship, to share her opinion that Petitioner suffered from schizophrenia and see if the State would be open to pleading Petitioner to life. App. 3579–80. Giese informed Dr. Crawford that one victim's family was adamant that the State should seek the death penalty

and the State was reluctant to go against their wishes. App. 3521–22. However, Giese indicated he would not oppose an *ex parte* meeting between defense counsel and Judge Cooper to discuss a potential guilty plea in exchange for Judge Cooper sentencing Petitioner to life. App. 3522.

On February 24, 2005, Petitioner's attorneys—Pringle, Lominack, and Sampson—met with Judge Cooper in his chambers. App. 3523. Pringle, Petitioner's lead attorney, attempted to elicit an affirmative promise from Judge Cooper that he would sentence Petitioner to life if Petitioner pled guilty. App. 3527. During the meeting, Judge Cooper and Pringle briefly discussed Scott Turow's book, "The Ultimate Punishment,"[5] and its admonishment that capital punishment be reserved for the "worst of the worst." App. 3526–28. Judge Cooper also repeatedly told trial counsel to trust Dr. Crawford. App. 3530.

Pringle attests that the meeting ended after she stated she did not want to find herself on the witness stand at a capital PCR hearing trying to explain why she pled her client without an assurance from the judge and Judge Cooper responded, "there will never be a capital PCR hearing, you don't have to worry about that."[6] App. 3528–29. Judge Cooper has no recollection of making this comment, but admits he was sympathetic to Petitioner and inclined to impose life sentences during the pre-trial phase based on trial counsels' portrayal of Petitioner's severe mental illness and acknowledges that he may have made comments indicating as much. App. 3039.

---

[5] Turow, Scott. 2003. *Ultimate Punishment: A Lawyer's Reflections on Dealing with the Death Penalty.* New York: Farrar, Straus, and Giroux.

[6] Recounting her meeting with Judge Cooper during her testimony at the PCR hearing, Pringle testified, "the last thing I remember saying is I cannot be sitting on a witness stand in a capital PCR explaining why I pled my client in a death penalty case where he ended up getting death where I had no assurance from you, from the judge. I said I think I know what you're saying, but I've got, you know, I don't think I can do that. And then he said Fielding there will never be a capital PCR hearing, you don't have to worry about that." App. 3528–29.

Pringle signed an Affidavit on September 7, 2005—several months after the sentencing—which outlined the circumstances leading to the *ex parte* meeting and her recollection of the meeting in detail. Pringle stated that Judge Cooper invited her, Lominack, and Sampson to an in chambers meeting, without a law clerk or secretary present. Pringle further stated:

> I told him why we were there and he said he knew and he was glad because he had been "dropping us hints" to plead the case in front of him. He acknowledged that one time he had dropped a hint on the record and also acknowledged that his loaning me Scott Turow's book "The Ultimate Punishment" was another such time. He had loaned this book to me in the summer of 2004 after notice was served on [Petitioner] and after Cooper had been assigned to the case. I returned the book to him some time after August 2004 with a note of thanks tucked inside. He stated that he, like Scott Turow, believes capital punishment should be reserved only for the "worst of the worst" and only in the rarest of times. I told him that worried me because he might think [Petitioner] was the worst of the worst. I told him the details and facts of the crimes [Petitioner] had committed. He responded that that did not mean [Petitioner] was the worst of the worst, that what he had done might be, but there might be things that mitigate the situation. We told him [Solicitor] Giese was adamant that Judge Cooper would give him life if we'd plead the case. I asked him why. At that point he said well there's something you should know. He told me he had called [Solicitor Giese] earlier in the week after the pre-trial hearings to see if he could resolve the case, if there was any way to plead it. He told us the solicitor was very upset and that he "counseled him" and tried to help him see that business is business and not to take things personally. He said that [Solicitor] Giese told him that he would not be upset if Judge Cooper gave [Petitioner] life if he pled. I continued to mention that Dr. Crawford said the judge would give [Petitioner] life. At one point, Judge Cooper responded that we would have to trust our expert Dr. Crawford. Judge Cooper also said that we should realize that no judge likes to be reversed and one way to ensure he was not reversed would be to give [Petitioner] life. I continued to ask him if he would tell me directly that he would give [Petitioner] life as opposed to talking around the issue. I told him I did not want to be sitting on a witness stand in a capital PCR hearing one day explaining why I pled [Petitioner] in front of a judge who would give him death. He responded, "there will never be a capital PCR hearing so you don't have to worry about that." At that point, we knew he had said what we needed to hear and we concluded the meeting. It was our interpretation of Judge Cooper's remarks that he was saying clearly and unequivocally that he would give Quincy a life sentence if we placed the case in his hands.

ECF No. 39-10 at 98–99.

In addition to this Affidavit, there is other evidence to support Pringle's testimony about the *ex parte* meeting. On February 25, 2005—the day after the *ex parte* meeting—Lominack sent an email to his co-counsel recounting "[his] reasons for thinking that [Judge Cooper] was telling us that he would definitely give Quincy life." *Id.* at 87. The email supports Pringle's testimony and Affidavit, *in toto*, including recounting Judge Cooper's statement about there being no PCR hearing. *See id.* (setting forth numerous statements from Judge Cooper). The email also indicates that Lominack discussed the meeting with two preeminent death penalty lawyers—David Bruck and John Blume[7]—both of whom agreed that Judge Cooper's statements were "clear signals that [Judge Cooper] is telling us exactly what he'd do." *Id.* Lominack noted in a second email that Judge Cooper also "said he would not be swayed by public opinion" and that Judge Cooper told defense counsel he had called Solicitor Giese earlier that week to ask him about a potential plea offer. *Id.* As a result of this call, Judge Cooper told defense counsel that "he believe[d] [Solicitor Giese] would not be upset with him no matter what the outcome." *Id.*

It is clear that defense counsel left this meeting with the clear and unequivocal understanding that Judge Cooper would sentence Petitioner to life if he pled guilty and that the evidence presented during the penalty phase needed to support their assertion of Petitioner's severe mental illness. *See* App. 3529–30. In contrast, Judge Cooper claims in an October 14, 2005 Affidavit[8] that he left the meeting thinking Petitioner was not going to plead guilty and he

---

[7] Pringle testified at the PCR hearing that, after the meeting, she called Blume and Lominack called Bruck. App. 3551–52.

[8] In the same Affidavit, Judge Cooper stated that he had "no recollection of any PCR discussion"; however, he "admit[ted] that throughout the pre-trial phase of this case, [he] was inclined, if the matter were left in [his] hands, to impose life sentences based on what [he] had been told by the Defense team of [Petitioner's] severe mental illness." App. 3122. Judge Cooper further

continued with his preparations for trial. App. 3038–39.

The next day, trial counsel met with Petitioner, informed him of their discussion with Judge Cooper, and advised him to plead guilty. Petitioner has repeatedly stated on the record that counsel did not tell him Judge Cooper made an express promise of a life sentence, nobody promised him any particular sentence, and he based his decision to plead guilty on his impression that he would have a better chance at a life sentence. *See, e.g.*, App. 0018–20 (expressing understanding during plea colloquy that Judge Cooper could sentence him to either life or death and stating nobody promised him any sentence); App. 3494–95 (testifying at PCR hearing that he did not expect to receive a particular sentence by pleading guilty and that counsel advised him he would "have a better chance" at life if he pled guilty).

With these facts in mind, the PCR court made the following conclusions:

The guilty pleas by Quincy Allen were freely and voluntarily entered and not the product of a promise of a life sentence by either the sentencing court or his counsel.

The decision to plead guilty in front of Judge Cooper was a strategic decision on the part of the defense team with a hope of receiving a life sentence, but that decision was not made based on a guarantee of a life sentence by the sentencing judge to counsel as counsel were aware that they had to convince the court of the existence of a significant mental illness and to dispute the conclusion of malingering.

Defense counsel knew it was a risk to waive a jury trial; however, they concluded and represented to Applicant that, based upon (a) the circumstances of the crime, and (b) their investigation into mitigation and, in particular, their investigation into the Applicant's mental health, that an extensive proffer of evidence (even if contested) could convince the plea judge to impose a life sentence.

Since there was no promise or guarantee of a life sentence, counsel was not

_____

acknowledged that he had "no doubt some of [his] comments may have indicated" sympathy. *Id.* However, Judge Cooper's Affidavit makes clear that, after hearing the testimony at the sentencing hearing, he "believe[d] [he] was misled" by defense counsel about the nature of Petitioner's mental illness and "the viciousness and brutality of [Petitioner's] crimes." *Id.*

deficient in failing to object to the death sentence on that basis.

The decision to advise the Applicant to plead guilty and be sentenced by Judge Cooper was a reasonable decision by counsel based upon their investigation of the facts.

Although the judge's actions may have indicated an inclination toward life sentences, all counsel understood it was not a guaranteed life sentence, and the judge refused to guarantee such a sentence in advance of the evidence.

ECF No. 22-2 at 6–7.

*Ground Five – Ineffective Assistance of Counsel*

In Ground Five, Petitioner alleges trial counsel were ineffective for advising him to plead guilty because they: (1) knew Richland County juries rarely imposed the death penalty, even for heinous crimes; (2) failed to obtain adequate assurance from Judge Cooper that he would sentence Petitioner to life; and (3) misrepresented their conversation with Judge Cooper to Petitioner, leading him to believe Judge Cooper would sentence him to life.  ECF Nos. 39 at 71–77; 63 at 49. Respondent maintains the PCR court's decision is supported by the record.  ECF No. 50 at 58–61.

As discussed above, the PCR court found Petitioner failed to prove either deficiency or prejudice.  Judge Cothran based this decision, in part, on his finding that Judge Cooper never promised a life sentence in exchange for Petitioner's guilty plea.  The Court agrees with Petitioner that the record does not support such a finding.  While Judge Cooper indicates that he never intended to issue an express "promise" or "guarantee," the Court sees no other way to interpret his comments during the *ex parte* meeting, especially his indication to Pringle that there would never be a capital PCR hearing, than as an implicit assurance at the very least.[9]  Nonetheless, the PCR

_____

[9] In addition, although the PCR court did not consider Judge Cooper's Affidavit, the Affidavit is part of the record before this Court.  Significantly, Judge Cooper does not deny making this statement in his Affidavit and openly admits he was inclined to sentence Petitioner to life prior to

court's decision that trial counsel were not deficient is supported by the record. Under the unique circumstances of this case, trial counsels' interpretation of Judge Cooper's comments made their advice to plead guilty more reasonable under the unique circumstances of this case. Indeed, because the Court finds trial counsels' interpretation of Judge Cooper's remarks was reasonable under the circumstances, their indication to Petitioner that he may have a better shot at a life sentence if he pled guilty was equally reasonable.[10] *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Petitioner's pleading also suggests that any defense attorney working a capital case in Richland County who pleads his client without an express assurance of a life sentence from the judge is per se ineffective.[11] Such a finding would directly contradict *Strickland*'s presumption of reasonableness, recognition of a "wide range" of reasonable professional assistance, and mandated

---

hearing all the evidence at the penalty phase and may have suggested as much to counsel through various remarks. The Court does not doubt the sincerity of Judge Cooper's assertion that he did not intend to convey a promise; however, the undisputed and reliable evidence of record supports defense counsels' recitation of what Judge Cooper said during the *ex parte* meeting, and those statements did, in fact, convey an assurance of a life sentence.

[10] Petitioner asserts trial counsel misled him to believe Judge Cooper had promised to impose a life sentence. *See* ECF No. 63 at 49. However, the record supports the PCR court's finding that counsel never told Petitioner that Judge Cooper had made any promises and that Petitioner understood from his conversation with counsel that a death sentence was still possible. This is critical, as Petitioner's understanding of what Judge Cooper told defense counsel is dispositive on the prejudice prong of the *Strickland* analysis.

[11] The Court acknowledges that juries in Richland County are generally hesitant to impose a death sentence. *See* ECF No. 39 at 72–73 (outlining the results of prior Richland County death penalty cases).

context-specific review of attorney performance:

> [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations omitted). Thus, the Court finds the PCR court reasonably applied *Strickland* in holding that trial counsel were not deficient.

Additionally, the Court finds Petitioner has failed to show the PCR court's prejudice finding was unreasonable. The Sixth Amendment's guarantee of effective assistance of counsel applies with equal force to critical pretrial matters, including the decision whether to plead guilty. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012); *Hill*, 474 U.S. at 58. *Strickland*'s two-part test governs the analysis, but here, the prejudice prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* This inquiry "focuses on a defendant's decisionmaking" and does not turn on the outcome of a defendant's actual criminal proceeding or potential outcome had a defendant chosen to proceed to trial. *Lee v. United States*, __ U.S. __, 137 S. Ct. 1958, 1966 (2017).

The Supreme Court has cautioned that, because "the strong societal interest in finality has 'special force with respect to convictions based on guilty pleas,' . . . [c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for an attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate

a defendant's expressed preferences." *Lee*, 137 S. Ct. at 1967 (quoting *United States v. Timmereck*, 441 U.S. 780, 784 (1979)).

Here, the only contemporaneous evidence related to Petitioner's decision to plead guilty is Petitioner's plea colloquy, during which, under oath, Petitioner indicated he understood that pleading guilty meant Judge Cooper, rather than a jury, would decide his sentence; acknowledged that Judge Cooper could either sentence him to life without parole or death; and affirmed that he had not been promised either sentence in return for his plea. App. 18–20. Petitioner has not shown any reason for the Court to doubt these representations and, in fact, re-affirmed these statements in his PCR testimony. Accordingly, the Court agrees with the PCR court's conclusion that Petitioner fails to show he suffered prejudice as a result of counsels' alleged deficiencies. *See Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977) ("[T]he representations of the defendant . . . [during the plea hearing], as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."). Respondent's Motion for Summary Judgment is granted as to Ground Five.

### Ground Six – Involuntary Guilty Plea

In Ground Six, Petitioner alleges he entered his guilty plea involuntarily because he relied on Judge Cooper's "implied assurances" of a life sentence in exchange for his plea. ECF No. 39 at 78–89. Petitioner clarifies that Ground Six "argues that his plea was involuntary because the trial judge indicated to counsel that he would impose a life sentence if Mr. Allen pled guilty, and

Mr. Allen relied on that assurance," thus focusing "on the trial judge's misleading conduct and not counsel's deficient performance." ECF No. 76 at 20. Petitioner claims the PCR court's decision was based on an unreasonable determination of the facts because his decision to grant Judge Cooper a protective order and quash the subpoena for his testimony resulted in a materially incomplete record. ECF No. 63 at 61–65. As a result, Petitioner asserts the Court should review this claim de novo. ECF No. 63 at 65.

Because a guilty plea involves the waiver of constitutional rights, it must be voluntary, knowing, and intelligent. *See Brady v. United States*, 397 U.S. 742 (1970).

> [A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Id.* at 755 (citation omitted). "Under this standard, a plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty." *Id.*

The Court is troubled by the procedural history of this case. The record of the *ex parte* meeting supports defense counsels' interpretation of Judge Cooper's comments as a promise not to impose a death sentence if Petitioner plead guilty. That finding inherently makes defense counsels' advice to Petitioner to plead guilty a reasonable, strategic decision, which forecloses relief on ineffective assistance of counsel grounds. However, that finding also begets the obvious question of whether Petitioner's guilty plea was involuntary *because of* that promise.

During the guilty plea hearing, Petitioner responded to a series of questions about the voluntariness of his plea. Petitioner acknowledged that Judge Cooper could impose either the death penalty or a life sentence. App. 18–19. Petitioner further stated that no one promised him

he would receive either a sentence of death or life without parole. App. 19; *see also* App. 20 (stating that no one had promised Petitioner any specific sentence). During the PCR hearing, Petitioner was asked, "[W]hen you [plead guilty], what sentence did you expect to receive?" App. 3494. Petitioner answered, "Well, I don't, I didn't expect to receive anything. I knew it could go either way." *Id.*; *see also* App. 3498 ("Q: Okay, but you still said there were no promises made, correct? A: Yes."). To that end, Petitioner testified that his attorneys told him about their meeting with Judge Cooper and "said Judge Cooper said if I pled guilty in front of him I'd have a better chance at a life sentence." App. 3495.

Defense counsels' testimony at the PCR hearing is in accord with Petitioner's testimony. Pringle testified that she met with Petitioner the day after the *ex parte* meeting and told him "that [she] thought that what Judge Cooper was trying to say is if [Petitioner] would plead guilty, that he was going to give him a life sentence and that it was [her] advice that [Petitioner] should do that." App. 3533. Pringle also told Petitioner "of [her] background with Judge Cooper and that [she] really trusted him and . . . believed him and . . . didn't think he would trick [them] or mislead [them] or do anything like that." *Id.* Specifically, however, Pringle testified that she did not use the word "promise" or "guarantee" when meeting with Petitioner. App. 3533–34.

Therefore, under either a de novo or deferential standard of review, the fact remains that neither Judge Cooper nor trial counsel made any promise or misrepresentation to Petitioner and, thus, as demonstrated by Petitioner's responses during the plea colloquy and PCR evidentiary hearing, he was not induced to plead guilty by any improper means. Put simply, while the only evidence in the record supports a finding that defense counsel reasonably believed a promise had been made, no such promise was relayed to Petitioner and Petitioner did not enter a guilty plea in

reliance on any such promise.  As the PCR court noted, "[s]ometimes in state post-conviction relief

actions, the testimony of the [Petitioner] is the most persuasive.  This is one of those times."  App.

4201.  There is nothing in the record to suggest "that his admissions in open court were anything

but the truth." *Id.* at 758.

The proceedings below are unusual in many ways, and this Court is troubled by what

occurred.  On the one hand, Judge Cooper, perhaps unintentionally, conveyed an implicit assurance

to defense counsel to sentence Petitioner to life without parole.  On the other hand, defense counsel

did not relay that assurance or promise to Petitioner prior to his guilty plea.  Therefore, Petitioner

could not have relied on such a promise.  In light of Petitioner's testimony during the guilty plea

and the PCR hearing, the Court must conclude that Petitioner's guilty plea was knowingly and

voluntarily entered based on strategically sound advice from his attorneys.  Accordingly, the Court

is constrained to resolve the issues before it in light of the well-established case law governing

federal habeas corpus litigation.

### *Request for an Evidentiary Hearing & Motion for Discovery*

Petitioner requests an evidentiary hearing "in order to hear from the trial judge himself to

resolve whether he did make statements implicitly assuring counsel that he would impose a life

sentence were Mr. Allen to plead guilty."  ECF No. 63 at 65.  In addition, Petitioner moves for

discovery of Judge Cooper's entire file on this case.  ECF No. 85.

Under the AEDPA, evidentiary hearings are generally prohibited even when a habeas

petitioner has failed to develop the factual basis of a claim in his state court proceedings.  28 U.S.C.

§ 2254(e)(2); *see Cullen v. Pinholster*, 563 U.S. 170, 181–84 (2011) (recognizing both that "review

under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim

on the merits" and also that for claims for which the factual basis was not developed in state court "§ 2254(e)(2) bars a federal court from holding an evidentiary hearing, unless the applicant meets certain statutory requirements").  However, the statute itself creates an exception to the general rule if the petitioner can show that the claim relies on a new, retroactive rule of constitutional law or "a factual predicate that could not have been previously discovered through due diligence[,]" and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.*

Thus, the Fourth Circuit has recognized:

A petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963).

*Juniper v. Zook*, 876 F.3d 551, 563 (4th Cir. 2017) (quoting *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006)).  The six *Townsend* factors are:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 372 U.S. at 313.

Petitioner's stated reason for requesting the hearing and discovery[12]—to receive additional

---

[12] As to Petitioner's Motion for Discovery, ECF No. 85, the parties agreed that Judge Cooper's counsel would review Judge Cooper's file and submit any documents relevant to the *ex parte* meeting for the Court's *in camera* review.  Judge Cooper's counsel—an employee of the South

evidence regarding what was said or not said by Judge Cooper during the *ex parte* meeting with counsel—has no bearing on these claims. What matters is Petitioner's perspective of the circumstances supporting his decision to plead and Petitioner has consistently and repeatedly asserted the basis for his plea on the record. Accordingly, the Court denies Petitioner's request for an evidentiary hearing and motion for further factual development related to Grounds Five and Six. *See also Schriro v. Landrigan*, 550 U.S. 465, 474 (2000) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."); *Wolfe v. Johnson*, 565 F.3d 140, 165 n.36 (4th Cir. 2009) ("'[G]ood cause' [for discovery] will exist when 'specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'") (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)).

For these reasons, Respondent's Motion for Summary Judgment is granted as to Grounds Five and Six.

### *Preserved Portions of Ground Seven*

In Ground Seven, Petitioner asserts his trial counsel were ineffective for putting forth an incomplete mitigation presentation based on the false belief that Judge Cooper had agreed to give Petitioner a life sentence. ECF No. 39 at 90–98. Specifically, Petitioner contends counsel should

---

Carolina Attorney General's Office—submitted several documents for the Court to review *in camera*. ECF No. 87 at 8. The Court has reviewed these documents and DENIES Petitioner's Motion for Discovery, ECF No. 85. In so ruling, the Court finds that there is not good cause for production of the requested discovery, and the Court specifically concludes that Petitioner cannot show that he would be entitled to relief if the requested documents were produced. These documents have been included on the docket as a Court Only exhibit and can be found at Docket Entry Number 89.

have: (1) called lay witnesses with firsthand knowledge of his abusive childhood, rather than presenting that evidence through a social worker; (2) presented expert testimony to rebut evidence suggesting Petitioner malingered his mental illness symptoms; and (3) investigated and presented neuropsychological evidence of Petitioner's brain impairments. *Id.* Petitioner raised the first two portions of this ground in his PCR application and/or on PCR appeal and Respondent asserts they are preserved for review. However, the third portion is, admittedly, defaulted. The Court will address the preserved portions now and the defaulted portion further below.

Under *Strickland*,

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes that particular investigation unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. 690–91. Thus, counsel must conduct a reasonable investigation, thorough enough to make an informed decision regarding which mitigating evidence to present. In assessing counsel's investigation, the Court "must consider an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2009) (quoting *Strickland*, 466 U.S. at 688, 689).

Further, to establish a Sixth Amendment violation, Petitioner "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Porter v. McCollum*, 558 U.S. 30, 41 (2009). "A reasonable probability is a probability sufficient

to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To assess that probability, the Court must "evaluate the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweigh it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

*Evidence of Childhood Trauma and Abuse*

During the penalty phase, trial counsel called several witnesses who testified about Petitioner's difficult upbringing. Valerie Schultz, a guidance counselor at Petitioner's high school, testified that she became aware that Petitioner had been thrown out of his home and was living in the woods. App. 0928. She indicated she and several other teachers tried to help him. App. 0928– 29. Ms. Schultz testified Petitioner demonstrated academic aptitude and potential but always kept to himself and appeared sad. App. 0933–36. She described a marked decline in Petitioner's hygiene, which she linked to living outside of a "home situation" for so long. App. 0931–32.

Hope Spillane, Petitioner's high school English teacher, described Petitioner as a good student with immature social skills who struggled to fit in with his peers. App. 0956–59. She also remembered some deterioration in Petitioner's appearance later in his junior year. App. 0961–62.

Margaret Britt, another teacher at Petitioner's high school, remembered Petitioner struggling to afford snacks and as being in need of attention. App. 0984–85. She recalled Petitioner as a good kid, but awkward and withdrawn, and also described a time when Petitioner's hygiene had steeply declined and he appeared rattled. App. 0986–89, 1002.

Cheryl Hart, Petitioner's neighbor when he was seven to nine-years-old, was friends with Petitioner's mother and described her financial problems. App. 1765–66. She testified that Petitioner's step-father beat his mother while she was pregnant with his younger siblings and that

the family did not have heat, food, or electricity for a period of time.  App. 1766.  Ms. Hart recalled Petitioner's mother worked all day and did not return home until 2:00 a.m., leaving Petitioner to care for himself and his three younger siblings.  App. 1767.  She described observing Petitioner and his siblings drinking water from a gutter, hearing Petitioner's mother beating the children, and seeing a mark on Petitioner's sister's face where their mother had hit her with a belt buckle.  App. 1768–69.

Petitioner's friend and neighbor, Brian Santiago, and Brian's parents testified that Petitioner was repeatedly kicked out of his house for extended periods of time and forced to live anywhere he could find shelter, including the bushes, a treehouse, an abandoned house, and a McDonalds play area.  App. 1785–87, 1806, 1817–18.  The Santiagos took Petitioner in for a while and described him as grateful, respectful, and quiet.  App. 1788, 1808.  They contacted Petitioner's father but he also refused to help.  App. 1803–04.  The Santiagos also noticed a decline in Petitioner's demeanor over time and eventually cut ties with him.  App. 1802–03, 1807–08, 1815–16.

Edwina Walker, who spent time with Petitioner and his mother when he was young, testified about several incidents of abuse, including witnessing Petitioner's mother beating him with a belt.  App. 1861–63.  She indicated Petitioner's mother treated him much worse than her other children.  App. 1863–64.

Deborah Grey, a licensed social worker, presented an extensive and exhaustive account of Petitioner's life history, from birth until right before the murders.  App. 1035–318.  Ms. Grey reviewed over 1,400 pages of records relating to Petitioner's educational history, mental health, medical and dental history, employment, family court proceedings, and time in prison.  App. 1043–

48.  In addition, Ms. Grey interviewed Petitioner and his mother, father, brothers, and two aunts. App. 1204–08.  She attempted to talk to additional family members, but they refused to speak with her.  App. 1204–08.

Ms. Grey's testimony detailed specific instances of abuse and neglect throughout Petitioner's childhood and described his resulting mental decline.  *See* App. 1050–1217.

In his PCR application, Petitioner alleged his trial counsel were ineffective for failing to present mitigation evidence of his childhood trauma and abuse.  *See* ECF No. 22-2 at 47.  At the PCR evidentiary hearing, Petitioner presented testimony from the following additional lay witnesses regarding his childhood and his abusive mother: Bennie Richard Gordon, Petitioner's step-brother; Phyllis Blake, Petitioner's step-cousin; Kirsten Kirkland, Petitioner's cousin; Martell Whitaker, who was incarcerated with Petitioner for a time; and Peggy Clore, Petitioner's music teacher who also taught several of Petitioner's siblings.  App. 3765–878.

Petitioner lived with his father and Mr. Gordon for approximately two years when he was fifteen or sixteen.  App. 3767.  Mr. Gordon testified that Petitioner's father regularly beat Petitioner with a belt, got into physical altercations with Mr. Gordon's mother, and had no interest in spending time with the boys.  App. 3769–73.  He portrayed Petitioner as a good big brother and student with an active social life.  App. 3774–77.

Ms. Blake testified that she met with Petitioner's trial attorneys in 2004 but told them she was busy and did not wish to be involved.  App. 3788.  However, she stated she would have testified at Petitioner's trial if she had been subpoenaed.  App. 3788–89.  Ms. Blake testified regarding the maternal side of Petitioner's family tree and described multiple generations of abusive parents.  She indicated Petitioner's mother and her siblings were abused and neglected by

their mother and they and their children and many of Petitioner's relatives exhibited odd, sometimes violent, behavior and got into legal trouble. App. 3794–802. Ms. Blake described Petitioner's mother as both physically and mentally abusive to her children and said she was particularly hard on Petitioner and never showed him any affection. App. 3802–04, 3807. She also recalled feeling afraid of Petitioner, thinking he was scary, and having a feeling something was wrong with him. App. 3805–06. However, she felt Petitioner never had a chance at life because of his upbringing and stated executing him would have a personal impact on her. App. 3807–08.

Ms. Kirkland, Ms. Blake's daughter, recalled witnessing Petitioner's mother's harsh treatment of her children. App. 3824–25. She went to high school with Petitioner for one year and described other kids, including his cousins, bullying Petitioner. App. 3826–27. Ms. Kirkland stated she was twenty-four years old at the time of Petitioner's trial and was not contacted by Petitioner's attorneys. App. 3827–28. She indicated she would have testified if asked and that Petitioner's execution would have a personal impact on her. App. 3828–29.

Mr. Whitaker was incarcerated with Petitioner for seven months when Petitioner was nineteen years old. He stated Petitioner was intelligent, often studied the dictionary, and that he had a rough childhood and regretted not being able to protect his mother from his stepfather's abuse. App. 3838–39. He described Petitioner as the little brother he never had and said Petitioner's trial team never contacted him. App. 3841.

Ms. Clore taught Petitioner music in elementary school and then taught his siblings. App. 3860. She stated that one of Petitioner's attorneys for his North Carolina case interviewed her, but not his South Carolina attorneys. App. 3860–61. Ms. Clore testified she did not have disciplinary

problems with Petitioner but that his brothers were a handful. App. 3864. When she mentioned their behavior to the guidance counselor, she was told not to send a note home because their mother would punish them by withholding food. App. 3865. Ms. Clore later learned the cafeteria workers would send food home with the children because they would be locked out of the house after school until their mother got home. App. 3865–66.

Quoting from Petitioner's own appellate brief, with direct references to the record, the PCR court detailed a significant portion of trial counsels' mitigation presentation, including testimony from the Santiagos, Petitioner's neighbors, and Ms. Grey. ECF No. 22-2 at 47–52.

The PCR court concluded:

> The above recitation details just a portion of the mitigation case presented by defense counsel during the mitigation phase as summarized by Applicant's own appellate counsel in the direct appeal. Defense counsel presented numerous witnesses at that stage including three of Applicant's teachers from high school. The record shows that defense counsel presented an extensive mitigation case and giving great focus to Applicant's childhood. While Applicant presented several different witnesses in the PCR action, the evidence in PCR was simply not particularly compelling or of great import. Applicant's PCR claim on the mitigation issue is hereby denied.

ECF No. 22-2 at 52. In addition, the PCR court specifically found, "The manner the defense presented the evidence in mitigation was informed by professional decisions, not the product of neglect, in an attempt as a matter of strategy to convince Judge Cooper in a cogent manner that life was the appropriate sentence" and "[c]ounsel were not deficient in their mitigation presentation concerning not eliciting so-called execution impact evidence or additional evidence concerning the Applicant's childhood experiences." ECF No. 22-2 at 6, 7.

Petitioner contends the PCR court unreasonably applied *Strickland* because "the idea that the post-conviction evidence was cumulative is relevant only to prejudice, not to deficient

performance" and the court failed to re-weigh the combined PCR and trial mitigation evidence against the evidence in aggravation. ECF No. 63 at 74–77. Regarding trial counsels' performance, Petitioner asserts they unreasonably failed to investigate and present the lay witness testimony presented at PCR. *Id.* at 67. He continues to contend that this testimony provided a "fuller picture" of his abusive childhood and "might have been more convincing than the account conveyed by the mitigation specialist." *Id.*

Notably, while Petitioner ostensibly challenges trial counsels' investigation, he does not specify what further actions they should have taken. The Court assumes Petitioner's assertion is that counsel should have contacted and interviewed the witnesses who testified at PCR. However, PCR testimony shows that the trial team did contact Ms. Blake, who refused to speak with them, and had Ms. Clore's potential statement through Petitioner's North Carolina counsel.[13] In addition, trial counsel testified at PCR that they interviewed Petitioner's brothers and sister, who spoke openly to them and the mitigation specialist about the abuse but were reluctant to testify. App. 3601–04. Counsel testified the defense team contacted Mr. Gordon but decided not to call him as a witness because they "felt like there was more proof of abuse in [Petitioner's] life f[rom] people who were here than from his family outside." App. 3929–32.

Further, despite Petitioner's disagreement, after a thorough review of the evidence presented at trial and at PCR, the Court finds the PCR court's assessment reasonable. While the PCR evidence may have added some details of Petitioner's abusive and neglectful upbringing, it did not significantly "alter[] the sentencing profile presented to the sentencing judge." *Strickland*,

---

[13] In addition, it appears Ms. Grey interviewed Ms. Clore. *See* App. 1092–93 (referring to a Ms. Peggy Clora who taught all of the Allen children).

466 U.S. at 700. It is not unreasonable or against prevailing professional norms for counsel to rely on a qualified mitigation investigator and other experts. *See Rhodes v. Hall*, 582 F.3d 1273, 1283 (11th Cir. 2009) ("Since . . . counsel hired investigators who interviewed potential witnesses and shared all of their information with counsel, we cannot say that counsel performed deficiently by delegating the mitigation investigation to them."). In addition, as the Supreme Court has recognized, "there comes a point at which [more evidence] can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van Hook*, 558 U.S. at 11; *see also Rompilla*, 545 U.S. at 389 ("Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there."). Thus, trial counsel are not required to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," *Wiggins*, 539 U.S. at 533, but, rather, must uphold their "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 691. Once counsel has conducted their investigation, decisions concerning the calling of witnesses are matters of strategy and ordinarily cannot constitute ineffective assistance. *Jones v. Barnes*, 463 U.S. 745, 808 (1983).

Based on the Court's review of the evidence and relevant precedent, the PCR court's decision does not "lie well outside the boundaries of permissible difference of opinion." *Tice v. Jonson*, 647 F.3d 87, 108 (4th Cir. 2011) (holding "[m]indful of the deference owed under AEDPA, we will not discern an unreasonable application of federal law unless 'the state court's decision lies well outside the boundaries of permissible differences of opinion.'") (quoting *Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006)). Accordingly, the Court finds

Petitioner has failed to show the PCR court's decision was contrary to, or an unreasonable application of, clearly established federal law.

*Additional Mental Health Experts – Dr. Hilkey and Dr. Griffin*

In addition, Petitioner asserts trial counsel failed to thoroughly investigate and present evidence of his severe mental illness and brain impairments. ECF No. 39 at 93. Specifically, in this preserved portion of the claim, Petitioner contends trial counsel should have called Dr. James Hilkey and Dr. Adrian Griffin to "explain how [Petitioner's] history of embellishing or exaggerating symptoms on some occasions did not rule out that [he] was indeed severely mentally ill." *Id.* Dr. Hilkey and Dr. Griffin both testified at Petitioner's North Carolina sentencing and were available to testify at the South Carolina proceeding.

Petitioner did not raise this claim in his PCR application and, thus, the PCR court did not address it in its order. Petitioner's PCR counsel deposed Dr. Hilkey and provided that deposition, along with Dr. Hilkey's 2003 psychological evaluation of Petitioner and 2004 addendum to the evaluation as exhibits in the PCR action. *See* App. 4555–609. Although Dr. Griffin had passed away by the time of Petitioner's PCR action, PCR counsel filed as an exhibit the entire transcript of Petitioner's North Carolina proceeding, including Dr. Griffin's testimony. *See* App. 5123–61.

Petitioner raised this claim in his amended petition for writ of certiorari, ECF No. 22-6 at 69–76, and the State argued it was procedurally barred and also lacked merit, ECF No. 22-7 at 21–22. The Supreme Court of South Carolina summarily denied the petition, but stated the denial was "on the merits." ECF No. 22-9. Accordingly, Petitioner exhausted this claim by fairly presenting it to the state's highest court. However, it is not properly preserved. Respondent does not assert this portion of Ground Seven is procedurally barred but contends it is preserved for review. ECF

No. 50 at 25. And both parties appear to analyze this claim under § 2254(d)'s deferential standard. However, the Court is left without a state court decision to which to defer. Out of an abundance of caution, the Court has conducted a de novo review of this portion of Ground Seven and finds it lacks merit. Thus, the Court would reach the same conclusion under a more deferential review.

Petitioner's mental status was hotly contested throughout the penalty phase of his trial, resulting in a textbook battle of the experts. Ms. Grey spent a considerable portion of her testimony discussing Petitioner's erratic behaviors, psychiatric admissions, suicide attempts, mental illness risk factors, and his mental status leading up to the murders. *See* App. 1034–216.

Trial counsel then presented four mental health experts. Dr. Richard Harding, an expert in child psychiatry, testified regarding his treatment of Petitioner's rumination disorder[14] and general opinion of his overall mental status. *See* App. 1321–75. Petitioner was referred to Dr. Harding in the fall of 1997 and by then had experienced periods of rumination for almost a decade. App. 1327. Shortly after he began treatment with Dr. Harding, Petitioner was admitted to a psychiatric unit after a confrontation with his mother. App. 1329–30. Dr. Harding was Petitioner's attending physician and diagnosed him with depression, rumination, and identity disorder. App. 1330–31. About eight days later, Petitioner was again hospitalized after a perceived suicide attempt. App. 1331–32. At the end of that hospitalization, Dr. Harding again diagnosed depression, rumination, and identity disorder. App. 1337. Dr. Harding testified that Petitioner's behaviors were not consistent with anti-social personality disorder but could foreshadow the possibility of a more

---

[14] According to Dr. Harding's testimony, rumination is a very uncommon disorder "that is found mostly in very young children from one to three where children are able to bring up stomach contents into their mouths and generally re-swallow them." App. 1324. From a psychiatric standpoint, it is a "form of self comfort," "a way of keeping control on emotions, a calming kind of activity that is effective for the people who do it." App. 1325–26.

serious mental illness, like schizophrenia. App. 1338–39.

Dr. George Corvin, an expert in general and forensic psychiatry who also testified at Petitioner's North Carolina sentencing, reviewed Petitioner's medical records and evaluated him on five separate occasions. App. 1387–90. Dr. Corvin opined Petitioner suffered from schizophrenia and explained why he had previously diagnosed Petitioner with schizoaffective disorder. App. 1390–92. Dr. Corvin specifically testified he did not believe Petitioner was malingering and thoroughly explained his opinion. App. 1419–24. Further, Dr. Corvin had reviewed reports from several of the State's experts finding malingering and discussed, at length, why he disagreed with those findings. App. 1425–42, 1506–10.

Dr. Pamela Crawford, an expert in forensic psychiatry, reviewed eight to ten thousand pages of records, interviewed 23 people, and interviewed Petitioner six times and ultimately diagnosed Petitioner with schizophrenia. App. 1551. Regarding malingering, Dr. Crawford testified:

> there is certainly at some point in North Carolina where he is exaggerating or feigning symptoms. I think there's really no question about that. Where - - and I say exaggerating and feigning which doesn't necessarily mean malingering. It doesn't necessarily mean he's doing it to avoid the death penalty. But I think that he is exaggerating or citing symptoms that either aren't real or they're exaggerated in some way.

App. 1586–87. She further explained:

> Now, malingering or feigning symptoms does not mean you also do not have a mental illness. And that's the other thing. We have numerous times mentally ill people who sometimes minimize symptoms, which I think he did at one point, and sometimes exaggerate symptoms. It doesn't mean there's not a mental illness. But it means you've got to look through all that stuff to determine what is in the mental illness and what is the exaggeration of it. So that's something that's been very important in this case and difficult in this case.

App. 1587.

Dr. Crawford discussed in detail why she believed Petitioner was not faking his reports of hallucinations. App. 1588–605. As part of that discussion, Dr. Crawford referenced her interview with Dr. Griffin and Dr. Griffin's opinion that Petitioner was clearly psychotic. App. 1592–97. Dr. Crawford noted:

> [W]hat's significant about this is, Dr. Griffin who is not a forensic psychiatrist in this issue, who was not involved in this issue recognized [Petitioner] as being psychotic and started him on medication. Against, that's something other than just [Petitioner's] report. And I asked him is it possible he was malingering, and he says absolutely not. He could tell that this person was mentally ill. And he treated people in the jail. So that was significant to me.

App. 1596–97.

Dr. Crawford also directly addressed some of the State's experts' opinions finding malingering and anti-social personality disorder. App. 1599–602, 1627–37, 1653–54, 1674–79. She explained her disagreement with those findings and discussed Petitioner's results on the Structured Interview of Reported Symptoms ("SIRS")—a test to assess whether a patient is malingering. App. 1631–33. She testified that when Petitioner was given the test in North Carolina, the results indicated he was exaggerating, but not malingering, and again emphasized that the results did not "rule out that he was mentally ill, but there may be some exaggeration of symptoms." App. 1632. When Petitioner was given the same test three weeks prior to his South Carolina trial, the results showed no evidence of malingering. *Id.*

Dr. Donna Schwartz-Watts, an expert in forensic and correctional psychiatry, met with Petitioner several times and referred him for civil commitment and opined Petitioner suffered from schizophrenia. App. 1831–32. On cross-examination, Dr. Schwartz-Watts stated she did not believe Petitioner was malingering. App. 1846.

In response, the State called several experts who opined Petitioner was malingering, each

of whom was subject to cross-examination by trial counsel. *See* App. 1983–84, 2010–59 (testimony of Dr. James Ballenger regarding malingering); App. 2229–30, 2247–88 (cross-examination of Dr. Ballenger); App. 2106, 2118–36 (testimony of Dr. Karla deBeck regarding malingering); App. 2140–98 (cross-examination of Dr. deBeck); App. 2325–43 (testimony of Dr. David Hattem regarding malingering); App. 2343–44 (cross-examination); App. 2349–65 (testimony of Dr. Camilla Tezza regarding malingering); App. 2365–86 (cross-examination); App. 2404–07 (testimony of Dr. Majonna Mirza regarding malingering); App. 2407–31 (cross-examination). Notably, the State's experts also testified that people can malinger but still suffer from an underlying mental illness. App. 2127–28, 2175, 2340.

In his sentencing order, Judge Cooper stated he had "listened to and read the accounts of all of the psychiatrists and psychologists on this case," including Dr. Hilkey. App. 2531. He outlined the disagreement between the experts and found, "These contrary opinions lead me to no firm conclusions as to Mr. Allen's mental state at this time." App. 2531–33.

The evidence introduced at PCR showed Dr. Hilkey, a forensic psychologist, spent considerable time evaluating Petitioner prior to the North Carolina sentencing and administered a battery of psychological tests. App. 4966–67, 4971, 5044. Dr. Hilkey opined Petitioner was seriously mentally ill and suffered from a schizophrenic spectrum disorder. App. 4970. Dr. Hilkey acknowledged that his tests, like the prosecution's, showed Petitioner tended to exaggerate his symptoms. App. 4968. He testified that he paid close attention to those results and even had two of the tests peer-reviewed. *Id.* On one test, a national expert confirmed the results indicated "a person who has some exaggeration, but a person who was suffering from schizophrenia and was psychotic." App. 4968–69. Dr. Hilkey explained:

58

[O]ften times individuals will exaggerate, especially early in their illness, as a way to draw attention to their illness to make sure that people see that they in fact need help. And that is my interpretation of the results of those tests that are exaggerated. It is in many ways a plea for help or a way of addressing or calling attention to the problems that he had.

When you look at the profiles you'll see that some of the clinical scales are elevated, some of them are not. And this tells me that there was, the symptoms that were real and true for Mr. Allen were endorsed. Other scales that were also pathological that did not apply were not endorsed. And this pattern of responses would be consistent with people who are making a real attempt to convey the problems that they have, albeit some of those were exaggerated in ways that may be trying to draw attention to their illness and their pain.

App. 4969.

On cross-examination, Dr. Hilkey directly addressed the issue of malingering at length and maintained his position that many of Petitioner's test results indicated he exaggerated symptoms, but did not rule out his diagnosis of a chronic, severe mental illness. App. 5028–49.

Sometime after Petitioner's North Carolina sentencing, Dr. Hilkey was contacted by Petitioner's South Carolina trial counsel. App. 4561. Dr. Hilkey met with trial counsel and reevaluated Petitioner, at their request. App. 4563–64. Trial counsel had Dr. Hilkey on standby during the South Carolina proceeding but did not call him to testify. App. 4566, 4570, 4581. During his deposition, Dr. Hilkey stated he was prepared to testify as he did in North Carolina— that there was some exaggeration but that Petitioner was chronically and severely mentally ill. App. 4568.

Dr. Griffin was a psychiatrist with a Surry County, North Carolina mental health center who evaluated Petitioner after he exhibited bizarre behavior in jail. App. 5123–24. He was not retained by either side and was not compensated for his testimony. App. 5147. Regarding his first meeting with Petitioner, Dr. Griffin testified:

When I saw him he was delusional. False beliefs. Difficulty in comprehending what was happening. I only saw him basically 10 or 15 minutes the first time. But I was worried enough to start him on a medication called Abilif[y]. Abilif[y] is one of our new antipsychotic medications, to reintegrate thought processes. Because I look at people how they interact with me. And I felt that he had what we would call frontal lobe disassociation. Frontal lobe is here. Responsible for your higher mental faculties, planning, rationalization, consideration, courtesy, thoughtfulness. That was not there.

App. 5129.

Dr. Griffin met with Petitioner two more times and opined he exhibited signs of schizoaffective and bipolar disorders. App. 5126, 5135. Dr. Griffin formed his opinions solely based on his personal interactions with Petitioner. He did not review any prior testing or reports or speak with any of the other mental health professionals who had treated Petitioner, nor had he reviewed Petitioner's confession or the video of the North Carolina murders. App. 5147–48, 5154–55.

Dr. Griffin did not offer an opinion as to whether Petitioner was malingering, except to state that, in his experience, people with psychotic illnesses tend to attempt to cover them up. App. 5139. He explained: "If you're flawdly (sic) psychotic - - there's a question we always debate: If you're psychotic you cannot turn psychosis on and off at will. So you cannot be a remarkably good actor. I'm going to act psychotic today and not tomorrow. That's not psychosis." *Id.* Notably, Dr. Griffin did not respond or offer rebuttal when the prosecution informed him other mental health professionals had diagnosed Petitioner with anti-social personality disorder and malingering. *See* App. 5147–52.

The evidence at PCR and sentencing suggest trial counsel were aware of Dr. Griffin and their team was in contact with him. *See, e.g.*, App. 1592 (Dr. Crawford refers to interviewing Dr. Griffin); App. 3538–40 (Pringle testifying regarding Dr. Griffin's North Carolina testimony and

stating she went to see him and interviewed him and thought he would be an excellent witness); App. 3636 (Lominack testifying he specifically remembered Dr. Griffin, thought he was a good witness, and would have called him if he had not been under the impression Judge Cooper was going to give Petitioner a life sentence).

To the extent Petitioner asserts trial counsel conducted a deficient mental health investigation because they did not discover Dr. Hilkey and Dr. Griffin, that claim is clearly without merit. The record unequivocally shows that trial counsel and their team were well aware of Dr. Hilkey and Dr. Griffin and the potential content of their testimony. Thus, Petitioner's precise claim is that trial counsel were deficient for not calling these two witnesses in the South Carolina proceeding and that Petitioner was prejudiced because they did not testify. Petitioner has failed to show prejudice and is not entitled to relief on this claim. *See Strickland*, 466 U.S. at 687 ("Unless a defendant makes both showings [deficiency and prejudice], it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.").

Regardless of trial counsels' reason for not presenting Dr. Hilkey and Dr. Griffin, the testimony they could have offered "would barely have altered the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 700. During sentencing, multiple experts on both sides explained that Petitioner's malingering or exaggerating symptoms did not preclude a finding of severe mental illness. Dr. Crawford in particular offered lengthy rebuttal testimony concerning the state's experts' opinions. Dr. Crawford also discussed Dr. Griffin's findings and why his opinion in particular was significant. Further, Dr. Griffin's testimony added little, if anything, to the malingering debate. Dr. Hilkey's testimony may have reinforced Dr. Crawford's but does not

add anything of substance to the information already before the court. Moreover, Judge Cooper stated on the record that he considered Dr. Hilkey's findings in reaching his decision and Petitioner has offered nothing to dispute that record evidence. Thus, additional testimony from Dr. Hilkey and Dr. Griffin would have been cumulative and largely insignificant. *See Wong v. Belmontes*, 558 U.S. 15, 23 (2009) (finding no prejudice where cumulative evidence would have "offered an insignificant benefit, if any at all").

Petitioner has not shown how that insignificant benefit could have tipped the scales in his favor. As discussed above, while Judge Cooper thoroughly considered all of the evidence before him concerning Petitioner's mental illness, he found only that the evidence did not convince him Petitioner suffered from a severe mental illness when he committed the crimes, but if Petitioner did have schizophrenia at the time, his illness "did not control his mind to such a degree as to exonerate or lessen the culpability of his actions." App. 2529–31. Similarly, Judge Cooper expressed ambivalence regarding Petitioner's mental status leading up to the crimes and at the time of sentencing. App. 2529–30, 2533.

Petitioner has not shown how additional evidence from Dr. Hilkey and Dr. Griffin would have altered Judge Cooper's analysis. Further, there is no evidence, nor does Petitioner assert, that if Judge Cooper had found Petitioner mentally ill, he would not have still imposed a death sentence; accordingly, Petitioner has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Petitioner's assertion of mental illness, while a key element of the sentencing proceeding, was not the only factor Judge Cooper considered. Judge Cooper also found significant the extremely aggravated nature of Petitioner's crimes, his seemingly nonchalant attitude about his

actions, his expressed desire to be a serial killer, and his repeated indications that he would continue to kill if given the opportunity. *See* App. 2549–52. And Judge Cooper's comment that, even if Petitioner suffered from schizophrenia, it did not lessen his culpability, App. 2529–31, suggests an affirmative finding that Petitioner suffered from severe mental illness may not have convinced him to give Petitioner a life sentence.

For these reasons, having independently "reweigh[ed] the evidence in aggravation against the totality of available mitigating evidence," *Wiggins*, 539 U.S. at 534, the Court finds Petitioner has failed to show his trial counsel were ineffective for not calling Dr. Hilkey and Dr. Griffin at sentencing, and he is not entitled to relief on this claim.

Accordingly, Respondent's Motion for Summary Judgment is granted as to these two portions of Ground Seven.

*Ground Eight*

In Ground Eight, Petitioner claims South Carolina's death penalty statute, S.C. Code Ann. § 16-3-20(B), violates the Sixth, Eighth, and Fourteenth Amendments by forcing a capital defendant who pleads guilty to give up his right to have a jury decide his sentence.[15]  ECF No. 39

---

[15] S.C. Code Ann. § 16-3-20(B) provides:

> When the State seeks the death penalty, upon conviction or adjudication of guilt of a defendant of murder, the court shall conduct a separate sentencing proceeding.  In the proceeding, if a statutory aggravating circumstance is found, the defendant must be sentenced to either death or life imprisonment. . . . The proceeding must be conducted by the trial judge before the trial jury as soon as practicable after the lapse of twenty-four hours unless waived by the defendant.  If trial by jury has been waived by the defendant and the State, or if the defendant pleaded guilty, the sentencing proceeding must be conducted before the judge.  In the sentencing proceeding, the jury or judge shall hear additional evidence in extenuation, mitigation, or aggravation of the punishment.

at 98–102.  Petitioner raised this issue through pretrial motions, which were denied, and again on

direct appeal.  *See* App. 3177–86.  The Supreme Court of South Carolina analyzed and rejected

Petitioner's Eighth and Fourteenth Amendment arguments but did not directly address Petitioner's

Sixth Amendment claim other than through reference to prior decisions rejecting similar

assertions.  *See Allen*, 687 S.E.2d at 25–26.

<em>Sixth Amendment Claim</em>

Petitioner asserts § 16-3-20(B) violates a capital defendant's Sixth Amendment right to

have a jury, rather than a judge, find any fact necessary to the imposition of a death sentence.  ECF

No. 39 at 99.

Because the state court did not directly address the merits of this portion of Ground Eight,

Petitioner asserts the Court should review his Sixth Amendment claim de novo.  ECF No. 63 at

78–79.  Alternatively, Petitioner asserts the state court's determination, if it did address the merits,

was contrary to and an unreasonable application of clearly established federal law, specifically,

the United States Supreme Court's decisions in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst

v. Florida*, __ U.S. __, 136 S.Ct. 616 (2016).  *Id.*  Petitioner's argument fails under either standard

of review.

This District has considered this argument twice before and found South Carolina's death

penalty statute complies with the Sixth Amendment.  *See Mahdi v. Stirling*, No. 8:16-cv-3911-

TMC, 2018 WL 4566565, at *41–42 (D.S.C. Sept. 24, 2018) (finding "South Carolina's capital

sentencing procedures have not violated Mahdi's constitutional rights" where Mahdi pled guilty

and agreed to the facts as stated by the State during his plea); *Wood v. Stirling*, No. 0:12-cv-3532-

DCN-PJG, 2018 WL 4701388, at *15–18 (D.S.C. Oct. 1, 2018), *Report and Recommendation*

*adopted by* 2019 WL 4257167 (D.S.C. Sept. 9, 2019) (finding the state court did not err in finding South Carolina's death penalty statute does not violate either the Sixth or Fourteenth Amendment). Petitioner has not distinguished his case from *Mahdi* or *Wood* or provided the Court with novel argument warranting reconsideration of its prior holdings.

In addition, the Fourth Circuit has rejected the same challenge to Virginia's capital sentencing scheme, which is functionally equivalent to South Carolina's,[16] finding *Ring* did not hold "that a defendant who pleads guilty to capital murder and waives a jury trial under the state's capital sentencing scheme retains a constitutional right to have a jury determine aggravating factors." *Lewis v. Wheeler*, 609 F.3d 291, 309 (4th Cir. 2010). Petitioner "acknowledges" the Fourth Circuit's decision in *Lewis* and that Virginia's statutory scheme is "comparable" to South Carolina's, but "contends that *Lewis* is inconsistent with *Ring*," without further elaboration. ECF No. 63 at 78. Petitioner's disagreement with the Fourth Circuit's conclusion is not reason for the Court to disregard the Fourth Circuit's clear position on this issue.

For these reasons, and those stated in *Mahdi* and *Wood*, the Court finds Petitioner has not shown a Sixth Amendment violation or that the state court's decision was an unreasonable application of federal law and is not entitled to habeas relief on this claim.[17]

---

[16] Under Virginia's capital sentencing scheme, when a defendant is charged with a death-eligible offense, the trial court first submits the issue of guilt or innocence to a jury. If the defendant is found guilty, then the same jury decides the penalty. However, if a defendant pleads guilty and waives his right to a jury determination of guilt, a judge conducts the sentencing proceeding alone and determines the existence of any aggravating factors. *See* Va. Code Ann. § 19.2-257.

[17] While Respondent's Motion for Summary Judgment was pending, the Supreme Court of the United States decided *McKinney v. Arizona*, 140 S. Ct. 702 (Feb. 25, 2020), which addresses a similar issue. In *McKinney*, the Court clarified "Under *Ring* and *Hurst*, a jury must find the aggravating circumstance that makes the defendant death eligible. But importantly, in a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge)

*Eighth and Fourteenth Amendment Claim*

Petitioner further asserts South Carolina's capital sentencing structure violates his Eighth and Fourteenth Amendment rights by denying him the right to present a jury with the mitigating evidence that he pled guilty and, therefore, accepted responsibility for his crimes. ECF No. 39 at 99–102 (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)).

The Supreme Court of South Carolina found this claim lacked merit. *See Allen*, 687 S.E.2d at 25–26. After summarizing its prior decisions upholding the death penalty statute's constitutionality under the Sixth Amendment, the court found:

> Contrary to Allen's assertion, the statute's requirement that the trial court conduct the sentencing does not deprive him of due process, nor does it result in cruel and unusual punishment. S.C. Code Ann. § 16-3-20(C) requires that, in capital sentencing proceedings conducted by the judge alone, the judge consider any mitigating circumstances allowed by law and must also consider the enumerated statutory aggravating and mitigating circumstances. Although Allen would suggest otherwise, he was indeed permitted to offer evidence of his remorse, and his acceptance of responsibility, to the trial court. Further, the trial court was required to receive evidence in extenuation, mitigation, and aggravation of punishment, and was required to find the existence of statutory aggravating circumstances beyond a reasonable doubt prior to imposing a sentence of death. S.C. Code Ann. § 16-3-20(B) & (C).
>
> Contrary to Allen's contention, the sentencer was not precluded from considering, as a mitigating factor, that he accepted responsibility and showed remorse. Allen's Eight[h] and Fourteenth amendment claims are without merit.

*Id.*

Petitioner argues the state court decision is an unreasonable application of federal law

---

is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range." *Id.* at 707. However, in *McKinney*, the defendant was convicted by a jury and then sentenced by the judge, *id.* at 705—06, and the Court did not address a situation like this one where a defendant pleads guilty, waives his right to a jury trial, and admits the facts supporting the finding of aggravating circumstances.

because the statute forced him to "choose between his Eighth Amendment right to present the mitigating effect of acceptance of [responsibility] in the form of a guilty plea and his Sixth Amendment right to a jury trial."  ECF No. 63 at 77–80.  Petitioner contends the state court's analysis is contrary to the Supreme Court of the United States' finding in *United States v. Jackson* that the death penalty provision of the Federal Kidnaping Act was unconstitutional because it "impose[d] an impermissible burden upon the exercise of a constitutional right." 390 U.S. 570, 572 (1968).

Essentially, Petitioner asserts an Eighth Amendment right to have a jury consider the mitigating impact of his guilty plea.  However, Petitioner has not identified Supreme Court precedent establishing such a right.  "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a *mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original).

Petitioner argues pleading guilty is the best possible evidence of his remorse and acceptance of responsibility.  While that may be so, under the statute, if he chooses to plead guilty and waive his right to a jury trial, the judge—the sentencer—is required to consider any mitigating factor, including Petitioner's remorse and acceptance of responsibility.  And, should a capital defendant choose to proceed with a jury trial, nothing in the statute precludes that defendant from showing the jury the relevant aspects of his character—his remorse and acceptance of responsibility—in other ways.  Thus, either scenario preserves a capital defendant's Eighth and Fourteenth Amendment right to present his sentencer with any mitigating aspect of his character,

and the statute preserves the defendant's right to choose whether that sentencer will be a jury or a judge.

For these reasons, the Court finds Petitioner fails to show the state court's decision unreasonably applied clearly established Supreme Court precedent or was based on an unreasonable determination of the facts. Accordingly, Respondent's Motion for Summary Judgment is granted as to Ground Eight.

***Procedurally Barred Claims***

Procedural default is an affirmative defense that is waived if not raised by respondents. *Gray v. Netherland*, 518 U.S. 152,165–66 (1996). If the defense is raised, it is the petitioner's burden to raise cause and prejudice or actual innocence; if not raised by a petitioner, the court need not consider the defaulted claim. *Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995). Here, Respondent contends Ground Four and part of Ground Seven are procedurally barred. Petitioner argues he can establish cause for any procedurally barred claims of ineffective assistance of trial counsel under *Martinez v. Ryan*, 566 U.S. 1 (2012).

In *Martinez*, the Supreme Court held,

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

*Id.* at 14.  Accordingly, Petitioner may establish cause for the defaulted grounds if he demonstrates that (1) his PCR counsel was ineffective and (2) the underlying ineffective assistance of trial counsel claim is a substantial one, i.e., it has some merit.

### Ground Four

In Ground Four, Petitioner asserts his guilty plea was unknowing and involuntary due to the effects of medications he was taking and that trial counsel were ineffective for not ensuring he understood the significance and consequences of pleading guilty.  ECF No. 39 at 60–71.

#### Expansion of the Record

In support of this claim, Petitioner offers a 2019 report by Dr. Susan E. Rushing, MD, JD, opining Petitioner's medications "would result in cognitive impairment," ECF No. 39-11 at 108, and declarations from PCR counsel regarding their investigations and strategy, ECF Nos. 63-2, 63-3.  Petitioner also requests an evidentiary hearing to resolve alleged factual disputes.  ECF No. 63 at 39–40.  Respondent opposes any expansion of the record related to this claim but admits Petitioner may introduce extra-record evidence "in support of an argument to excuse any procedural default."  ECF No. 74 at 3 n.3.  The Court agrees and grants Petitioner's request to expand the record with respect to Dr. Rushing's report and PCR counsels' declarations but will consider this evidence only as it relates to Petitioner's claims of cause and prejudice to excuse the default.  *See Fielder v. Stevenson*, No. 2:12-cv-412-JMC, 2013 WL 593657, at *3 (D.S.C. Feb. 14, 2013) (finding while "[s]ection 2254(e)(2) sets limits on a petitioner's ability to expand the record in a federal habeas proceeding[,] . . . courts have held that § 2254(e)(2) does not similarly constrain the court's discretion to expand the record to establish cause and prejudice to excuse a petitioner's

procedural defaults").

However, the Court denies Petitioner's request for an evidentiary hearing. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. at 474. Thus, to grant an evidentiary hearing, "there 'must be a viable constitutional claim, not a meritless one, and not simply a search for evidence that is supplemental to evidence already presented.'" *Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016) (quoting *Ayestas v. Stephens*, 817 F.3d 888, 896 (5th Cir. 2016) (per curiam), *judgment vacated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018)). *Martinez* itself provides little guidance regarding when a claim is viable or substantial, other than a "cf." cite to *Miller-El v. Cockrell*, which describes the standards for certificates of appealability. *Martinez*, 566 U.S. at 14. Based on *Miller-El*'s holding, a petitioner alleges a substantial claim "by demonstrating that jurists of reason could disagree with the district court's resolution . . . or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

"This threshold inquiry does not require full consideration." *Id.* at 336. "Where documentary evidence provides a sufficient basis to decide a petition, the court is within its discretion to deny a full hearing." *Runningeagle v. Ryan*, 825 F.3d 970, 990 (9th Cir. 2016); *accord Schriro*, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"); *Segundo*, 831 F.3d at 351 ("*Martinez* and *Trevino* protect . . . habeas petitioners from completely forfeiting an [ineffective assistance of counsel] claim; neither entitles petitioners to an evidentiary hearing

in federal court in order to develop such a claim.").

For the reasons below, based on the record and Petitioner's newly offered evidence, the Court finds Petitioner has failed to allege a substantial claim and is not entitled to an evidentiary hearing.

### Discussion

Respondent does not dispute that at the time of his February 2005 meeting with trial counsel and subsequent plea, Petitioner was taking two antipsychotic medications, Geodon and Prolixin Decanoate, and two medications to help with side effects from those medications and with insomnia, Cogentin and Benadryl. While his recorded doses of Cogentin and Benadryl appear to be within the normal range, all of the experts agree Petitioner was being administered significantly higher-than-normal doses of the antipsychotics. In particular, Petitioner received a 100mg injection of Prolixin Decanoate one day prior to his meeting with counsel to discuss pleading guilty. *See* ECF No. 39-10 at 34. All of the experts associated with this case consistently testified that Prolixin Decanoate and Geodon are normally started at a low dose and titrated over time. While it appears both medications were titrated throughout 2004,[18] the records suggest Petitioner had not received a Prolixin injection since November 2004, ECF No. 39-10 at 7 (noting orders to discontinue Prolixin on November 14, 2004). Petitioner began taking the relevant dose of Geodon in early December 2004. He did not receive Geodon while hospitalized from February 14, 2005 to February 24, 2005, but requested to restart Geodon and Prolixin on February 24, the day prior

---

[18] *See* ECF No. 39-7 at 141 (showing Petitioner received 25mg injections of Prolixin starting March 29, 2004); ECF No. 39-9 at 120 (showing Petitioner began receiving 100mg injections of Prolixin in May 2004); ECF No. 39-9 at 126 (showing Petitioner started taking Geodon in March 2004); ECF No. 39-10 at 11 (ordering Geodon increased from 80mg to 160mg to 240mg over time); ECF No. 39-10 at 7 (Geodon dose increased to 320mg on November 14, 2004).

to his meeting with counsel, ECF No. 39-10 at 31.

Petitioner's plea colloquy is not dispositive of this issue. *See Sanders v. United States*, 373 U.S. 1, 19–20 (1963) (finding administration of narcotic drugs while in prison could impact defendant's mental capacity in a way not apparent to the plea judge at the time). Rather, to show these medications rendered his plea involuntary, Petitioner must "demonstrate 'that his mental faculties were so impaired by drugs when he pleaded that he was incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights and of realizing the consequences of his plea.'" *United States v. Truglio*, 493 F.2d 574, 578–79 (4th Cir. 1974) (quoting *United States v. Malcolm*, 432 F.2d 809, 812 (2d Cir. 1970)); *see also Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993) ("The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.").

Neither the record nor Dr. Rushing's report show Petitioner suffered this level of impairment. Throughout 2004, Petitioner occasionally reported the Geodon made him tired during the day when he took it in the morning and that, when he took it at night, it made him feel "hungover" in the morning. ECF No. 39-9 at 135 (complained Geodon injection made him drowsy); ECF No. 39-10 at 12 (complained Geodon made him sleepy during the day when taken in the morning); ECF No. 39-10 at 30 (reports getting ten hours of sleep on Geodon, but feeling hungover in the morning). Petitioner's medical records leading up to February 2005 do not note any cognitive side effects specifically linked to Prolixin. Petitioner reported trouble sleeping, nightmares, and hearing voices throughout this time period and required inpatient psychiatric care three times. ECF No. 39-9 at 17 (March 29, 2004 admission); ECF No. 39-9 at 5 (November 22,

2004 admission); ECF No. 39-9 at 50 (December 3, 2004 summary of November 22 admission noting Petitioner reported trouble sleeping, nightmares, and hearing voices); ECF No. 39-10 at 40 (transfer summary for February 2005 admission after possible Benadryl overdose).

Regarding their meeting with Petitioner to discuss pleading guilty, trial counsel recalled Petitioner as "passive," "compliant," "easy to deal with," and quiet. App. 3533. Pringle attributed Petitioner's demeanor to finally getting his medications straight. App. 3533. Immediately before Petitioner's plea, Judge Cooper asked Pringle, "What is [Petitioner's] mental health condition in terms of medication, those issues today?" App. 0014. Pringle responded:

> Mr. Allen is currently being treated for psychotic disorders. He has been diagnosed with schizoaffective disorder and paranoid schizophrenia alternately, Your Honor. He is currently being treated with psychotropic drugs, medications. He received a shot for Prolixin last Thursday. He is also taking Geodon.
>
> He has been taking those medications continuously. But the Prolixin is a medication that he receives every two weeks and remains in his system. The Geodon is a medication that he takes every day. He is current on his medication and thinking clearly today, Your Honor.

App. 0014.[19] During the colloquy, Petitioner stated he was taking medication but the medication did not interfere with his ability to understand what he was doing and that he did, in fact, clearly understand what he was doing. App. 0022.

During the penalty phase, several of the experts testified concerning Petitioner's medications. Regarding potential effects of Petitioner's current doses of Prolixin and Geodon, Dr. Harding testified:

> Well, everybody has some variation. But I think those are both high levels of medication. And you would see serious sedation, as in if I took that I would

---

[19] In addition, in a February 28, 2005 email to Dr. Corvin, Pringle explained Petitioner's recent hospitalization and stated Petitioner was "back on meds, got a shot of Prolixin last week, and is much improved." App. 4455.

probably be asleep for the next three days, that type of level of medication. If you start at a very low dose and build up gradually over months, you could get to a point where somebody could function with that, but it's a lot of medication, that amount.

App. 1341.

Dr. Corvin testified that a non-psychotic person who had not received the proper titration would likely end up in the emergency room if administered Petitioner's dose of Prolixin. App. 1433–34. Recounting a description from one of his schizophrenic patients, Dr. Corvin testified "taking a neuroleptic like Prolixin" is like "throwing a wet towel over your brain. Everything just shuts down, slows down," including, hopefully, the psychotic symptoms. App. 1434. However, Dr. Corvin testified Petitioner's treatment notes indicated Petitioner was in the recreation hall playing cards the day after he received his first dose of Prolixin in 2004. App. 1435. Dr. Corvin agreed Petitioner received a large dose of Prolixin on February 24, 2005 without titration but noted: "It certainly has been my experience that patients with chronic psychotic illnesses can just . . . take large doses of medicines and it doesn't hit them in the same way that it would you and I, especially if they're not naïve to the medication." App. 1436.

Dr. Crawford noted Prolixin can cause people to appear more withdrawn and demonstrate flat affect and that Petitioner probably had those side effects. App. 1612. Regarding the dose of Prolixin that Petitioner received on February 24, 2005, Dr Crawford, who interviewed Petitioner on six different occasions leading up to trial, testified:

> Now, he's given a huge dose of Prolixin, not having been on Prolixin for a long time, I mean, a very large dose all of a sudden. Which you would expect that a person who is not psychotic to knock him out. What actually happened, and in my interviews with him, is that he had requested the Prolixin. He said that helps with the voices. This is not a medication people request. This has horrendous side effects. He requested the Prolixin. And on the Prolixin he told me the voices were better, he wasn't hearing voices at the time any more, and he was actually brighter.

Now, that's the exact opposite of what you'd expect by giving somebody a massive dose or a very large dose of Prolixin. You'd expect them to be, you know, less communicative. Well, with the voices improved, he's actually - - I mean, he's not talkative, but he would actually smile on occasion and seem a little bit better, and he said he had relief because the voices were gone, that the other antipsychotic had not been helping but the Prolixin did. And so I thought that was interesting, as opposed to suddenly seeing him - - I mean, as he is right now in court, he is on a huge amount of medication. And this isn't a huge amount of medication that was slowly increased 'til he could get to this point. Because, in fact, for how many days? 12 days he was off all medication and then he was slammed on the highest amount of recommended [Prolixin] Decanoate and a tremendous dose of something they call Geodon, another antipsychotic. Yet now as he is, he's actually the brightest I've seen him since I've been working with him.

. . . .

[H]e's less suspicious and guarded with me. He, you know, smiles at times. In fact, at one point he said hello, you know, turned to me and smiled which was not something I had from him before. There was like more of a person in there than there had been.

App. 1615–16.

Dr. Schwartz-Watts testified Petitioner was on the "highest dose of Prolixin Decanoate" she had ever seen in anybody and the maximum dose of Geodon. App. 1854. She also testified that neither Geodon nor Prolixin cause poverty of thought or poverty of speech. App. 1856.

During the PCR evidentiary hearing, Petitioner testified his medications slowed him down. App. 3497. He indicated he could not recall all of the details of his meeting with trial counsel because he was "under medication then." App. 3495. When asked later how the medications made him feel, he responded: "It just subdued my mind where I wasn't myself. I was slow motion. I couldn't think. You know what I'm saying? And I was just basically a zombie." App. 3967. Petitioner testified trial counsel went over the plea questions with him prior to the colloquy and he answered how counsel instructed him to. App. 3502–03. However, he never challenged the truth of his statements or expressed a lack of understanding of the process or its consequences.

Dr. Rushing reviewed Petitioner's medical records, transcripts of his guilty plea and the sentencing phase, and reports from the trial experts, as well as Dr. Frierson's 2013 report for the PCR hearing. ECF No. 39-11 at 102. However, Dr. Rushing never personally evaluated Petitioner. *Id.* After summarizing Petitioner's medication history, Dr. Rushing describes the medications Petitioner was on at the time of his plea and concludes, "The combination of these medications would result in cognitive impairment." ECF No. 39-11 at 108. In addition, Dr. Rushing expresses her "substantial doubts about [Petitioner's] understanding the significance and consequences of his pleading guilty and waiving his right to a jury trial at the time he plead guilty, given the effects of the medication administered." *Id.*

However, Dr. Rushing's opinion appears conclusory and speculative and is not enough to rebut the strong presumption that trial counsel performed reasonably and create a genuine issue of material fact. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (holding that "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)). She lists common side effects for each of Petitioner's medications, including: feeling sleepy, dizzy, irritable, fatigued, having blurred vision, feeling the need to move, dry mouth, nausea, vomiting, headache, lack of appetite, speech disturbance, tachycardia, anorexia, dyspepsia, depression, orthostatic hypotension, sensitivity to light, impaired body temperature regulation, sedation, nervousness, impaired coordination, urinary retention, paradoxical central nervous system stimulation, diaphoresis, and extrapyramidal symptoms. ECF No. 39-11 at 106–07. Less common side-effects of Geodon can include neuroleptic malignant syndrome, severe extrapyramidal symptoms, dystonia, QT prolongation, irregular cardiac rhythm,

seizure, syncope, stroke, severe hypertension, serotonin syndrome, agranulocytosis, leukopenia, neutropenia, and Stevens-Johnson Syndrome. ECF No. 39-11 at 106–07. Dr. Rushing notes Petitioner "was manifesting physical side effects from his medication when he was admitted to the hospital two weeks prior to the plea," ECF No. 39-11 at 107, but, other than her conclusory statement, Dr. Rushing does not describe any specific cognitive side effects Petitioner exhibited or even list common cognitive side effects of his medications. Thus, Dr. Rushing's report does not support Petitioner's allegation of cognitive impairment making him "'incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights and of realizing the consequences of his plea.'" *Truglio*, 493 F.2d at 578–79 (quoting *Malcolm*, 432 F.2d at 812).

Petitioner's reliance on the PCR testimony from counsel and Petitioner himself is equally unpersuasive. The PCR testimony suggests only that Petitioner was subdued, and possibly tired and thinking slowly. The record clearly shows trial counsel and their experts were acutely aware of Petitioner's ever-evolving mental state and his medications throughout their trial preparations. Further, at the time of his meeting with counsel, plea, and sentencing hearing, trial counsel, Judge Cooper, and numerous experts with personal knowledge of Petitioner's medications and mental state did not observe evidence of cognitive impairment. Rather, they expressed their beliefs, based on their personal observations of Petitioner both at the time and over the previous year, that he, for some reason, did not react to large doses of Prolixin as they would expect and was doing better after receiving the injection. Trial counsel has every right to rely on their experts' opinions and their own personal experience, observations, and judgment. *See Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998) (finding reasonably effective counsel not required to second-guess contents of

expert reports); *United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014) ("Attorneys exist to exercise professional judgment").

Thus, Petitioner fails to state a viable, substantial underlying ineffective assistance of counsel claim and cannot overcome the procedural bar. Respondent's Motion for Summary Judgment is granted as to Ground Four.

### Defaulted Portion of Ground Seven

In this defaulted portion of Ground Seven, Petitioner asserts trial counsel were ineffective for failing to present available neuropsychological evidence that Petitioner suffered brain impairments. ECF No. 39 at 95–98.

### *Expansion of the Record*

In support of this claim, Petitioner offers a new neuropsychological report from Dr. Joette James, ECF No. 39-11 at 111–28, and a 2019 affidavit from Lominack concerning his contact with Dr. Evans, ECF No. 39-11 at 97–99. Respondent opposes any expansion of the record for this claim. ECF No. 50 at 77. For the same reasons discussed in Ground Four, the Court will consider this extra-record evidence but only for the purpose of evaluating whether Petitioner has shown cause and prejudice under *Martinez*. Further, for the reasons below the Court finds Petitioner fails to allege a substantial underlying claim. Accordingly, to the extent Petitioner has requested an evidentiary hearing on this claim, the Court denies that request.

### *Discussion*

It is indisputable that trial counsels' primary strategy at sentencing was to convince Judge Cooper of Petitioner's mental illness and that they focused the bulk of their mitigation investigation

and presentation on mental health evidence. Trial counsels' investigation included a neuropsychologist, Dr. James Evans. ECF No. 39-11 at 97. Dr. Evans performed neuropsychological testing on Petitioner and provided the results to counsel. ECF No. 39-11 at 97–98, 129. However, counsel did not call Dr. Evans to testify or present his testing results by other means. In his affidavit, Lominack states that he "does not recall talking with Dr. Evans after he conducted the testing" and that he lacked the knowledge or experience at the time to have an informed discussion about the meaning of the test results. ECF No. 39-11 at 97–98. Petitioner contends this objective data would have provided context for his behavior, bolstered his case for severe mental illness, and provided Judge Cooper with an additional basis from which to conclude his behavior was the result of brain impairment and mental illness rather than malice. ECF No. 39 at 96–97.

Petitioner's claim lacks merit for several reasons. First, Petitioner has not shown that Dr. Evans's testing revealed any particularly mitigating information that would have added to trial counsels' sentencing presentation. Petitioner provides only Dr. Evans's raw data, which this Court is not qualified to interpret, and claims these results showed Petitioner suffered from impaired executive functioning. ECF No. 39 at 95; ECF No. 39-11 at 129. Petitioner's new expert, Dr. James, reviewed Dr. Evans's data and notes Petitioner showed: average to low-average intellectual ability; deficits in some aspects of executive functioning, including complex information processing speed, attention (both auditory and visual), and problem solving in the face of feedback; and weaknesses in tactile and motor functioning. ECF No. 39-11 at 113–14. She also indicates Dr. Evans noted Petitioner was heavily medicated at the time of his testing. ECF No. 39-11 at

113.

Neither Dr. James nor Petitioner offer any further explanation of these results, what they reveal about Petitioner, or exactly how they are mitigating. Accordingly, Petitioner fails to rebut the strong presumption that counsel acted reasonably in choosing not to present Dr. Evans or the results of his testing. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. . . . [However,] even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) ("Decisions about what types of evidence to introduce 'are ones of trial strategy, and attorneys have great latitude on where they can focus the [sentencer's] attention and what sort of mitigating evidence they can choose not to introduce.'") (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1571 n.9 (4th Cir. 1993)).

Dr. James's explanation of her results offers some insight into Dr. Evans's results. However, her results appear to differ in many ways, as one might expect considering her testing occurred fifteen years later. Where Dr. Evans noted deficits in information processing speed and attention, Dr. James found Petitioner performed in the average range "on simple measures of attention control." ECF No. 39-11 at 116. She later concluded Petitioner "demonstrates good initial attention, [but] lacks cognitive flexibility and is easily overwhelmed when faced with large quantities of information." *Id.* at 118. Dr. James then notes that "[i]mpaired attention is a common element of many psychiatric disorders, and problems with attention are frequently noted in patients

with depression, anxiety, mania, and thought disorders like schizophrenia." *Id.* Petitioner relies on this statement to support his argument that presentation of neuropsychological evidence could have bolstered the case that he suffered from a severe mental illness and was not malingering his symptoms. *See, e.g.*, ECF No. 39 at 97. However, Dr. James never explicitly finds Petitioner suffered impaired attention, nor does this statement directly link impaired attention to schizophrenia. Based on this statement alone, any deficit in Petitioner's attention could just as easily be linked to his repeatedly diagnosed depression.

In addition, where Dr. Evans noted a deficit in information processing speed, Dr. James found Petitioner average in this regard. ECF No. 39-11 at 117. Dr. James's report does not specifically mention "problem solving in the face of feedback," but Dr. James did find Petitioner demonstrated mild to moderate impairment in cognitive flexibility and problem solving, which is consistent with Dr. Evans's findings. *Id.* at 116.

Based on her results, Dr. James reached the following conclusions specifically about Petitioner:

> Mr. Allen presents with a complex neuropsychological profile. He demonstrates relative strengths in overall reasoning, particularly in the verbal domain. He also demonstrates relative strengths in core academic skills, including reading decoding, spelling, and sentence comprehension.
>
> In contrast, Mr. Allen presents with clear weaknesses in multiple, important domains of functioning; the chief areas of deficit are in some, though not all, aspects of executive functioning, particularly impulse control, emotional regulation, and cognitive flexibility. He also demonstrates relative weaknesses in complex working memory and planning/organization.
>
> . . . .
>
> Mr. Allen's attention and executive functioning deficits significantly interfere with

organized, efficient learning and recall, in that he is prone to becoming 'stuck,' making poor decisions, being overwhelmed by his emotions, encoding information much more slowly and inefficiently than would be expected and 'outputting' information more slowly as well. This is particularly true in new, novel, and stressful circumstances, where his ability to effectively function is undermined by multiple tasks or increasing complexity and emotional color. Information processing can prove to be extremely effortful for him at those times. These neurocognitive deficits make him highly vulnerable to overwhelm and overload, particularly when the situation is novel, complex, or emotionally laden. In such circumstances, he is less able to be future-oriented and resist the urge to act impulsively and is more likely to be distracted by short-term actions based on current emotions and impulses versus recognizing the future implication of those actions[.] His capacity to initiate and develop organized approaches to problems, self-monitor behaviors and actions, respond to feedback and revise an approach where it no longer seems to be working, are all likely to deteriorate under such conditions, making him subject to extreme and inappropriate reactions.

. . . .

Mr. Allen's impairments in these areas are very likely to interfere with his ability to utilize his cognitive strengths, and make him prone to poor adaptive functioning in real world settings, in that he is less able than most individuals with his base intellectual ability to regulate his emotions, control his impulses, think quickly and efficiently, respond appropriately to changing stimulus demands, and consider long-term consequences of his actions. Again, this is particularly true in situations that are complex, unfamiliar, fluctuating, present a great information load, and/or are emotionally laden.

ECF No. 39-11 at 117–21.

The Court fails to see how even Dr. James's impressions would have significantly altered the sentencing profile presented to Judge Cooper. *See Sears v. Upton*, 561 U.S. 945, 954 (2010) ("[T]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker") (quoting *Strickland*, 466 U.S. at 700). As Dr. James states in her report, "[i]n part, [Petitioner's] broader weaknesses in executive functioning may be gleaned from Mr. Allen's history, which indicates a longstanding history of extreme

emotional and behavioral dysregulation." ECF No. 39-11 at 118. That history was thoroughly

presented to Judge Cooper through the social historian, Ms. Grey.

Further, the Court fails to see the qualitative difference between neuropsychological testing

and the extensive psychological and psychiatric testing Petitioner underwent in this case.

Petitioner contends:

> The data from this neuropsychological testing would have provided mental health
> mitigation that was qualitatively different from the psychiatric presentation of
> mental illness and would have side-stepped the dispute over the correct diagnosis
> or malingering. The evidence of brain impairment would have also provided
> context for Mr. Allen's impulsive and irrational behavior, and would have relied on
> objective data from validated testing, as opposed to a battle of the experts regarding
> mental illness.

ECF No. 63 at 71–72. However, much of the dispute surrounding malingering was whether

Petitioner had malingered results on psychological testing. *See, e.g.,* App. 1653–54. There is no

indication that the neuropsychological testing used by Dr. Evans and Dr. James is any less

susceptible to manipulation than any other psychological testing. The results are certainly not any

more "objective," in the way a brain scan or blood test might be.

In short, Petitioner fails to show neuropsychological evidence would have done anything

but add to or bolster an already thorough mental health presentation. Thus, Petitioner fails to allege

a substantial underlying ineffective assistance of counsel claim and cannot meet his burden under

*Martinez*. This claim remains defaulted and Respondent's Motion for Summary Judgment is

granted as to Ground Four.

### *Ground Nine*

In Ground Nine, Petitioner alleges entitlement to relief based on cumulative error. ECF

No. 39 at 102–03. "Pursuant to the cumulative error doctrine, '[t]he cumulative effect of two or

more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990)). "Generally, however, if a court 'determine[s] . . . that none of [a Petitioner's] claims warrant reversal individually,' it will 'decline to employ the unusual remedy of reversing for cumulative error.'" *Id.* (quoting *United States v. Fields*, 483 F.3d 313, 362 (4th Cir. 2007)). Further, regarding claims of ineffective assistance of counsel, the Fourth Circuit has expressly stated courts are to review these claims individually, rather than collectively. *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998) ("Having just determined that none of counsel's actions could be considered constitutional error . . . it would be odd, to say the least, to conclude that those same actions, when considered collectively, deprived [the petitioner] of a fair trial. Not surprisingly, it has long been the practice of this Court individually to assess claims under *Strickland v. Washington*. . . . To the extent this Court has not specifically stated that ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively, we do now.") (internal citations omitted).

Having found no constitutional error, the Court also finds no cumulative error. Respondent's Motion for Summary Judgment is granted as to Ground Nine.

### *Respondent's Motion to Strike*

Respondent has moved to strike multiple documents Petitioner attaches to his pleadings and the portions of his pleadings relying on those documents. ECF No. 74. To the extent Respondent moves to strike the documents the Court has considered for the sole purpose of Petitioner's arguments in favor of cause and prejudice to excuse procedural default, the motion to

strike is denied. The motion is granted as to any document not expressly considered by the Court.

## CONCLUSION

The Motion for Summary Judgment [50] is **GRANTED**, the Amended Petition [39] is **DISMISSED**, Respondent's Motion to Strike [74] is **GRANTED IN PART** and **DENIED IN PART**, and Petitioner's Motion for Discovery [85] is **DENIED**.

## CERTIFICATE OF APPEALABILITY

The governing law provides that:

> (2) A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability . . . shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c). A prisoner satisfies the standard by demonstrating that reasonable jurists would find this Court's assessment of his constitutional claims debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). In this case, Petitioner has met the legal standard for the issuance of a certificate of appealability as to Grounds Five and Six. Therefore, a certificate of appealability is **GRANTED** as to those grounds.

**IT IS SO ORDERED**.

s/ Donald C. Coggins, Jr.
United States District Judge

March 25, 2020
Spartanburg, South Carolina